UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

MOHAMED QASEEM KAKAR,

                                        Plaintiff,

                v.

UNITED STATES CITIZENSHIP AND                    Civil Action No.
IMMIGRATION SERVICES,                            CV-16-5032 (KAM)

                                        Defendant.

-------------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BRIDGET M. ROHDE
Acting United States Attorney
*Counsel for Defendant*
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

September 13, 2017


LAYALIZA SOLOVEICHIK
Assistant United States Attorney
(Of Counsel)

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ..................................... 2

    A.    Statutory and Regulatory Framework ..................................................... 2

        1.    Arrivings Alien Indicating Intent To Apply For Asylum Are Shielded From Immediate Removal, Requiring A"Credible Fear" Determination, And May Be Placed In Removal Proceedings To Assess Asylum ............ 2

        2.    Relevant Changes To Terrorism Inadmissibility Grounds Since 2000 ...... 3

        3.    Asylee Applications For Adjustment To Permanent Residence Require Asylees To Establish Admissibility At The Time Of Such Application And, Moreover, Grants Of Status Adjustment Are Discretionary ............. 5

    B.    Administrative Proceedings ..................................................................... 7

        1.    Plaintiff Is Found To Be Inadmissible Owing To Lack Of Valid Entry Papers And Expresses Intent To Seek Asylum Based On Alleged Persecution By Taliban Arising From Alleged Religious Harassment, Arrest, Military Impressment .................................................................. 7

        2.    Plaintiff Applies For Asylum, In Order To Stave Off Removal ................ 8

        3.    Plaintiff's January 2006 Application For Adjustment Of Status ................ 9

        4.    USCIS's April 2016 Decision Denying The Adjustment Application ..... 11

    C.    Proceedings in District Court ................................................................ 12

ARGUMENT ....................................................................................................... 12

I.    USCIS'S APRIL 2016 DECISION SHOULD BE UPHELD ......................... 12

    A.    Scope Of Review ................................................................................... 12

    B.    USCIS Properly Denied The Adjustment Application ......................... 14

        1.    USCIS Properly Found Plaintiff Inadmissible On The First Ground ....... 14

        2.    USCIS Properly Found Plaintiff Inadmissible On The Second, Wholly Independent, Ground ................................................................ 17

    C.    USCIS Is Not Precluded From Denying The Adjustment Application On The Grounds Of Terrorism-Related Inadmissibility ....................... 20

CONCLUSION .................................................................................................... 25

i

## PRELIMINARY STATEMENT

Defendant United States Citizenship and Immigration Services ("USCIS"), by its attorneys Bridget M. Rohde, Acting United States Attorney for the Eastern District of New York, Layaliza Soloveichik, Assistant United States Attorney, of counsel, respectfully submits this memorandum of law in support of its cross-motion for summary judgment pursuant to Fed. R. Civ. P. 56 and in opposition to plaintiff's motion for summary judgment pursuant to Fed. R. Civ. P. 56 ("Pl. Mem.").

Plaintiff Mohamed Qaseem Kakar commenced this action seeking review, under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. ("APA"), of USCIS's April 5, 2016 decision denying plaintiff's application for status adjustment from asylee to lawful permanent resident.[1]

By way of background, in November 1999, plaintiff, an Afghan citizen, sought to enter the United States without valid entry documentation. He was issued a Notice to Appear before an Immigration Judge for removal proceedings, and promptly sought asylum status. In March 2000, following an asylum hearing as to whether plaintiff had a well-founded fear of persecution on any of the specified statutory grounds, he was granted asylum.

In 2006, plaintiff applied to USCIS for adjustment of status, seeking permanent residence. By this time, following 9/11, many changes to the INA had been enacted, *inter alia*, greatly expanding inadmissibility on terrorism-related grounds. In 2013, USCIS issued a Notice of Intent to Deny plaintiff's application ("NOID"), citing terrorism-related inadmissibility grounds, and gave plaintiff an opportunity to submit additional evidence in support of his application. In 2016, USCIS denied plaintiff's application, reasoning that plaintiff's own statements had showed that, in the service of the Taliban, he had been involved in "actual fighting" by using a Kalashnikov

---

[1] The Complaint also purports to bring this action seeking review of USCIS's decision under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ("INA"). However, he fails to identify any provision that would authorize judicial review.

"against" Taliban foes, and that he had washed, cleaned, and cooked for the Taliban for 25 days. USCIS found plaintiff inadmissible on two separate grounds: (i) he had engaged in terrorist activity, as defined under 8 U.S.C. § 1182(a)(3)(B)(iii)(V), by using a weapon with intent to endanger, directly or indirectly, and (ii) he had engaged in terrorist activity, as defined under 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc), by providing material support to the Taliban, a Tier I terrorist organization. USCIS rejected as inconsistent and not credible plaintiff's affidavit, submitted in response to the NOID, attempting to recast his earlier admission regarding using his Kalashnikov.

The denial of plaintiff's application for adjustment of status was not arbitrary, capricious, or an abuse of discretion and, to the contrary, was in accordance with law. Accordingly, this Court should grant USCIS summary judgment, deny plaintiff's motion for summary judgment, and dismiss this action in its entirety.

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### A.     Statutory and Regulatory Framework

#### 1.     An Arriving Alien Indicating Intent To Apply For Asylum Is Shielded From Immediate Removal, Requiring A "Credible Fear" Determination, And May Be Placed In Removal Proceedings To Assess Eligibility For Asylum

If an alien arrives at a U.S. port of entry lacking an unexpired visa or other entry document, he is inadmissible for that reason alone. *See* 8 U.S.C. § 1182(a)(7).

Under 8 U.S.C. § 1225, an immigration officer may promptly remove the alien; however, if the alien indicates an intent to apply for asylum or fear of persecution, an asylum officer must conduct an interview and, if he finds a credible fear of persecution preliminarily, then the alien is not immediately removed, but instead is placed in removal proceedings before an immigration judge. *See* 8 U.S.C. §§ 1225(b)(1)(A)(ii),(B)(i),(B)(ii),(B)(v), 1225(b)(2)(A); *see also* 8 C.F.R. 235.3(c).

2

While in removal proceedings, an alien may apply for asylum under 8 U.S.C. § 1158, the grant of which staves off a removal. *See* 8 U.S.C. § 1158(a) ("Any alien who is physically present in the United States or who arrives in the United States . . . may apply for asylum . . . ."); 8 U.S.C. § 1231(b)(3)(A) ("Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's face, religion, nationality, membership in a particular social group, or political opinion.").

In order for an alien to obtain asylum under § 1158, he must establish to the satisfaction of the immigration judge that he is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(a)(1); 1158(b)(1)(A). Section 1101(a)(42)(A), in turn, defines "refugee" in relevant part as a person "unable or unwilling to return to" his native country because of a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion." 8 U.S.C. § 1101(a)(42)(A). Thus, an asylum applicant must prove *both* that he fears persecution on account of one of these five grounds *and* that this fear is well-founded. *See also* 8 U.S.C. § 1158(b)(1)(B)(i); 8 C.F.R. §§ 208.13(a),(b).

Moreover, even if the applicant establishes this, there are exceptions that could preclude the grant of asylum. For example, an alien who has firmly resettled in another country prior to arriving the United States is ineligible for asylum. *See* 8 U.S.C. § 1158(b)(2)(A)(vi). Similarly, engaging in "terrorist activity," as defined by 8 U.S.C. § 1182(a)(3)(B)(i)(I)), renders an alien ineligible for asylum. *See* 8 U.S.C. § 1158(b)(2)(A)(v).

2. <u>**Relevant Changes To The Terrorism Inadmissibility Grounds Since 2000**</u>

Congress first promulgated the definition for aliens engaging in "terrorist activity" in the Immigration Act of 1990, Pub. L. No. 101-649, s. 601; 101 Stat. 4978, 5070 (1990), codified at INA § 212. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I).

However, that law was amended over time, including in 2001, 2005, and 2007. For example, the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001), among other things, broadened the terrorism-related inadmissibility grounds, and promulgated two new categories of terrorist organizations at 8 U.S.C. § 1182(a)(3)(B)(vi)(II) and (III); the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 302 (May 11, 2005), among other things, broadened the terrorism-related inadmissibility grounds further, and made all of the terrorist-related inadmissibility grounds bars to asylum; and the Consolidated Appropriations Act ("CAA") of 2008, Pub. L. No. 110-161, 121 Stat. 1844 (Dec. 26, 2007), among other things, designated the Taliban a Tier I, Foreign Terrorist Organization, for immigration purposes.

As to the CAA, more specifically, Congress explicitly designated the Taliban a "Tier I" terrorist organization within the meaning of 8 U.S.C. § 1182(a)(3)(B)(vi)(I):

> (d)   DESIGNATION   OF   THE   TALIBAN   AS   A   TERRORIST ORGANIZATION -- For purpose of section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. § 1182(a)(3)(B)), the Taliban shall be considered to be a terrorist organization described in subclause (I) of clause (vi) of that section.

CAA, § 691(d), 121 Stat. 1844.  Moreover, that designation was made retroactive pursuant to section 691(f):

> (f) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of enactment of this section, and these amendments and sections 212(a)(3)(B) . . .  of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B) . . . ), as amended by these sections, shall apply to . . . (2) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal *occurring or existing before*, on, or after *such date.*

CAA, § 691(f), 121 Stat. 1844.

In sum, engaging in "terrorist activity" renders an alien inadmissible. *See* 8 U.S.C. § 1182(a)(3)(B)(i). The INA defines "terrorist activity" to include, *inter alia*, an act "unlawful under the laws of the place where it is committed" (or, if committed in the United States, "unlawful under

4

the laws of the United States or any State") involving "use of any . . . firearm, or other weapon . . . with intent to endanger, directly or indirectly, the safety of one or more individuals . . . ." *See* 8 U.S.C. § 1182(a)(3)(B)(iii)(V).

However, today the INA also defines as one of the ways of engaging in "terrorist activity": "commit[ting] an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons . . . to a terrorist organization described in subclause (I) . . . of clause (vi)," which -- after the CAA, and retroactively -- include the Taliban. *See* 8 U.S.C. 1182(a)(3)(B)(iv)(VI)(cc).

3.   **Asylee Applications For Adjustment To Permanent Residence Require Asylees To Establish Their Admissibility At The Time Of Such Application And, Moreover, Grants Of Status Adjustment Are Discretionary**

Asylee status comes with many benefits, including, among them, the ability to obtain work authorization -- enabling the asylee to work legally in the United States and become a wage-earner and taxpayer -- and travel authorization -- enabling the asylee to travel freely across the U.S. border and abroad. *See* 8 U.S.C. §§ 1158(c)(1)(B),(C).

Another of these benefits is that, after residence in the United States for only one year, the asylee may apply for adjustment to permanent residence. *See* 8 U.S.C. § 1159(b)(2). Like all applicants for an immigration benefit, an applicant seeking an adjustment to permanent residence must establish eligibility at the time of filing and through adjudication. *See* 8 C.F.R. § 103.2(b)(1). In order to establish eligibility for adjustment to permanent residence, there are a number of requirements. For example, the asylee is ineligible if he has firmly resettled elsewhere. *See* 8 U.S.C. § 1159(b)(3).

The INA further explicitly requires that an asylee seeking adjustment of his status must be admissible to the United States *at the time of application for adjustment*. *See* 8 U.S.C. § 1159(b)(5); 8 C.F.R. § 209.2.  The INA states, in relevant part:

> The Secretary of Homeland Security [under whose authority USCIS acts] . . . in the Secretary's . . . discretion and under such regulations as the Secretary . . . may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who . . . is admissible . . . under this chapter *at the time of examination for adjustment* of such alien.

8 U.S.C. § 1159(b)(5) (emphasis added); *see also* 8 C.F.R. § 209.2(a)(v). Grounds for inadmissibility as a lawful permanent resident include "engag[ing] in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(i), as well as certain health-related, crime-related, and other grounds for inadmissibility inapplicable to asylum applications, *see* 8 U.S.C. § 1182(a)(1),(2),(5)-(10).

Even if the asylee proves that he is eligible for adjustment of status, the granting of such status is not his right, but rather is a discretionary benefit granted by the Department of Homeland Security (which includes within it USCIS).  *See* 8 U.S.C. § 1159(b)(1) ("The Secretary of Homeland Security . . . in the Secretary's . . . *discretion,* and under such regulations as the Secretary . . . may prescribe, *may* adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum . . . .") (emphasis added).

Unlike asylum in the context of removal proceedings, which effectively grants relief from removal, an asylee's adjustment application does not directly implicate his removability, nor does denial of such application cancel the applicant's asylee status or benefits. That asylum status (and concomitant benefits), where granted by an immigration judge, would require termination through re-opening of removal proceedings before an immigration judge by Immigration and Customs Enforcement ("ICE") attorneys.

B.      **Administrative Proceedings**

      1.      **Plaintiff Is Found To Be Inadmissible Owing To Lack Of Valid Entry Papers And Expresses Intent To Seek Asylum Based On Alleged Persecution By Taliban Arising From Alleged Religious Harassment, Arrest, Military Impressment**

On November 25, 1999, plaintiff entered the United States at John F. Kennedy International Airport. AR 187.[2] He was found to be an Afghan national lacking a valid, unexpired visa, and thus inadmissible under § 212(a)(7) of the INA. AR 187-88.

In a November 26, 1999 sworn statement, he stated that he was an Afghan citizen, who had traveled to the United States on a passport given to him by a smuggler. AR 169. He stated that his life was in danger from the Taliban, because he was of the Shiite faith. AR 170. He claimed that the Taliban had already seized him and some of his brothers. *Id.* When asked what the Taliban made him do, he said: "For one week I was there I was doing everything, cooking, washing clothes, and cleaning. They gave me a gun and I shot it." *Id.* He said that he had fled the Taliban. AR 171.

In a November 30, 1999 statement, plaintiff likewise asserted that he had been persecuted by the Taliban for listening to music, wearing his beard too short, praying in the Shia way, and by having been "drafted []to war against other Shiites," after which he fled. AR 185.

On November 30, 1999 he was interviewed by an asylum officer. AR 146, 160-67. The officer noted that plaintiff was represented by counsel, who was present at the interview. AR 160, 178. Plaintiff stated that he was an Afghan citizen, and had been living in Afghanistan prior to his arrival in the United States. AR 161-62. He had been born in 1977, was unmarried, and had no children. AR 161-62. He explained that he had fled Afghanistan because he feared for his life from the Taliban, since he had been arrested and beaten for listening to the wrong music, wearing too

---

[2] "AR" refers to the administrative record filed as D.E. No. 16. All references herein to "D.E." shall mean "Docket Entry" in the action styled *Kakar v. USCIS*, 16-CV-5032 (KAM), pending in the United States District Court of the Eastern District of New York

short a beard, and praying as a Shiite, and had run away from military impressment. AR 163-65. When asked about the military, he said that he had been "taken by force" and worked for the Taliban military for "25 days." AR 162-63. During that time he had worked as "a cook" and "fighting the opposition, the Massood Group" who were "Shiite." AR 163. The Taliban, he said, were "Sunni." AR 166.  He clarified that he "used a gun," specifically a "Kalashnikov" in order to "fight with" a group of men also armed with guns. AR 163. When asked to clarify if he "took part in the actual fighting," he responded, "Yes." AR 163. The asylum officer found a credible fear of religious persecution, such that there was a "significant possibility" that plaintiff could establish eligibility for asylum. AR 180-81; *see also* AR 176.

On December 7, 1999, plaintiff was served with a Notice to Appear ("NTA") for removal proceedings. AR 176-77. The only charge cited was that plaintiff, a citizen of Afghanistan and not the United States, had arrived at a port of entry without a valid entry document. AR 176. As such he was inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(1). AR 176.  The NTA did *not* cite any terrorism-related grounds under 8 U.S.C. § 1182(a)(3)(B)(i)(I).

### 2.   Plaintiff Applies For Asylum, In Order To Stave Off Removal

On or about January 21, 2000, plaintiff submitted his I-589 application for, *inter alia*, asylum and withholding of removal. AR 149-59. As the basis for his claim, he cited persecution on grounds of religion, membership in a social group, and political opinion. AR 153. The application dwelt at length on the Taliban's reaction to his beard, music, and prayer, noting that the Taliban were Sunni, whereas he was Shia, that his eldest brother had fought on the side of Massood, against the Taliban, and that "for a total of about one month" "I was forced to help the Taliban." AR 151-53.

Plaintiff also submitted an affidavit dated January 21, 2000, again desribing being arrested by the Sunni Taliban for his music, beard, and prayer as a Shia and again mentioning that his

8

brother had fought against the Taliban. AR 158. His affidavit reiterated that he had been taken by the Taliban, and after a week of training camp, he was then sent to Bamyan for "approximately 25 days" in order "to cook, wash clothes and do cleaning" for the Taliban. AR 158. "One day, the Taliban even made me take a gun and help them fight." *Id.* He averred that he did not agree with the Taliban, and feared for his life, so he fled to the United States. AR 158.

Plaintiff's brother, Tahir Kakar, submitted an affidavit in which he stated that he himself was a U.S. Citizen currently living in Queens. AR 140. He averred that plaintiff was one of his brothers and had been born in Kandahar, Afghanistan in 1977. AR 140.

The Immigration Court scheduled plaintiff for an "asylum hearing," which was also his "removal hearing," for March 28, 2000. AR 143-44.

On March 28, 2000, an Immigration Judge sitting in Jamaica, New York granted plaintiff asylum. AR 87; *see also* AR 86. No reason is given for the Order, which is a printout on which a box is checked off as to the award of asylum. AR 87. The Order noted that plaintiff's application for withholding of removal was not reached. AR 87.

### 3.   Plaintiff's January 2006 Status-Adjustment Application

On January 12, 2006, plaintiff submitted a Form I-485 application for adjustment of status (the "Adjustment Application"). AR 72-76. Biographical data submitted with the application stated that he had no spouse and had been employed as a food vendor since April 2001. AR 78.

On or around May 1, 2008, USCIS sent plaintiff a Request for Evidence, seeking an updated medical form. AR 60.  Plaintiff submitted medical documentation. *See, e.g.*, AR 62-66.

By letter dated December 10, 2012, plaintiff's attorney asserted that the Adjustment Application had been filed January 12, 2006 and that she had repeatedly made inquiries. AR 43. Plaintiff's attorney asserted that she had been told that plaintiff's application was "on hold" because it appeared that plaintiff was inadmissible on terrorism-related grounds. AR 43. Plaintiff's

counsel argued that her client was not inadmissible on such grounds. AR 43-44. Plaintiff submitted a sworn statement dated April 23, 2012 in which he stated that "the Taliban took me to a camp where they made me cook, wash clothes, and do cleaning" and that "one day, they forced me to take a gun and help them fight." AR 42.

On or about September 30, 2013, USCIS issued a Notice of Intent to Deny the Adjustment Application ("NOID"). AR 23-25. This NOID noted that plaintiff's November 26, 1999 credible-fear interview had mentioned that he had been for 25 days with the Taliban, and had fought for them against the Massood group; when asked if he had taken part in "actual fighting," he had responded in the affirmative, stating that he used a Kalashnikov against Massood's men, who had also had guns. AR 24. The NOID noted that plaintiff's combat service was supported by his January 21, 2000 affidavit stating that "one day, the Taliban even made me take a gun and help them fight." AR 24. The NOID also pointed out that the same affidavit had averred that plaintiff had cooked, washed clothes, and cleaned for the Taliban, which constituted material support for terrorist activities. AR 24. Plaintiff was given time to respond as to why he was not inadmissible for engaging in terrorist acts as defined by the INA. AR 25.

On October 29, 2013, plaintiff responded with a variety of legal arguments, including collateral estoppel on the grounds that admissibility had been litigated before the immigration judge. AR 26-32. Plaintiff submitted an affidavit stating that he never engaged in military training, and – for the first time – averred that he had "never intended to hurt or kill anyone" and "just fired the gun at nobody," and that had he "refused to take the gun, the Taliban would have killed [him]." AR 31. He admitted that he performed 25 days of forced labor cleaning, cooking, and washing clothes. AR 30.

10

**4.**     **USCIS's April 2016 Decision Denying Plaintiff's Adjustment Application**

On April 5, 2016, USCIS denied the Adjustment Application. AR 1-4; AR 73.[3] USCIS noted that, in order for an asylee to be eligible to apply for adjustment to permanent residence under INA § 209, he must establish that he is admissible. *See* 8 U.S.C. § 1159(b)(5). USICS found that plaintiff was inadmissible for engaging in two independent forms of "terrorist activity" as defined under § 212 of the INA to include, *inter alia*, (i) an act "unlawful under the laws of the place where it is committed" (or, if committed in the United States, "would be unlawful under the laws of the United States or any State") involving "use of any . . . firearm, or other weapon . . . with intent to endanger, directly or indirectly, the safety of one or more individuals," *see* 8 U.S.C. § 1182(a)(3)(B)(iii)(V); and (ii) "an act that the actor knows, or reasonably should know, affords material support . . . to a terrorist organization described in clause (I) . . . of clause (vi)," which includes the Taliban, *see* 8 U.S.C. 1182(a)(3)(B)(iv)(VI)(cc). AR 2-3.

As to the former, USCIS noted that plaintiff stated in 1999 and 2000 that he had used a Kalashnikov gun against Massood's men, the Taliban's foes, in the service of the Taliban in "actual fighting." AR 2-3. USCIS noted too that when its NOID had pointed out that this constituted terrorist activity, plaintiff had responded with the 2013 affidavit that, for the first time, asserted that he had, on pain of death, fired the gun, and that he had "fired the gun at nobody." AR 3-4. USCIS found the inconsistency not credible. AR 4. USCIS also noted that there was no duress exception for use of a weapon. AR 4. As to the second grounds, material support, USCIS noted

---

[3] On July 30, 2015, plaintiff had filed a lawsuit, demanding that USCIS adjudicate his Adjustment Application. That mandamus action was filed in the United States District Court for the District of Columbia. *See Kakar v. Johnson, et al.*, 15-CV-1231 (D.D.C.) (docket entry No.1). On April 5, 2016, the mandamus action was dismissed by stipulation, following USCIS's denial of the Adjustment Application, discussed in the text above. *See id.* (docket entry No. 18).

that plaintiff conceded that he had cooked, washed, and cleaned for the Taliban for 25 days, AR
2-4.[4]

**C.     Proceedings in District Court**

On September 9, 2016, plaintiff commenced this action seeking APA review of the
Adjustment Decision. On March 28, 2017, USCIS answered the Complaint.

Following USCIS's further review of the matter with the aim of achieving resolution
without judicial intervention, USCIS resolved to litigate the matter. *See, e.g.,* D.E. No. 12 (letter
the Court May 2, 2017 noting that the matter was still under review, and now at senior levels at
USCIS and, should USCIS reopen the case administratively, or approve the application, the
litigation would then be rendered moot); *id.* No. 13 (letter to the Court May 16, 2017, noting that
USCIS had declined to reopen the matter administratively). On July 12, 2017, plaintiff moved for
summary judgment.

## ARGUMENT

I.     **USCIS'S APRIL 2016 DECISION SHOULD BE UPHELD**

**A.     Scope Of Review**

The court's review in an APA case is limited to the administrative record.  5 U.S.C. § 706;
*Camp v. Pitts*, 411 U.S. 138, 142 (1973); *United States v. International Broth. of Teamsters*, 170
F.3d 136, 142 (2d Cir. 1999). Thus, many cases brought under the APA are disposed of on cross-
motions for summary judgment. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 884
(1990); *Gosnell v. Federal Deposit Ins. Corp.*, 938 F.2d 372, 375 (2d Cir. 1991); *Miezgiel v.*

---

[4]USCIS also cited and rejected the collateral estoppel argument plaintiff had made in response to
the NOID – in which plaintiff had argued that he had been found implicitly admissible under 8
U.S.C. § 1182(a) inasmuch as the immigration judge had presumably found him admissible for
purposes of asylum, the agency could not revisit his admissibility -- reasoning that the asylum and
adjustment applications were wholly separate proceedings and that there had been intervening
changes in law. AR 2-3.

*Holder*, 33 F. Supp.3d 184,186 (E.D.N.Y. 2014); *Just Bagels Mfg., Inc v. Mayorkas*, 900 F. Supp.

2d  363, 372 (S.D.N.Y. 2012). A statement under Local Rule 56.1 is not required on a summary

judgment motion in a case seeking review of an administrative action under the APA, because

such a case "presents only a question of law," as the district court judge conducts what is essentially

an appellate review of the challenged administrative action.  *Just Bagels*, 900 F. Supp. 2d at 372

n.7 (collecting cases); *accord Jarbie v. Holder*, 2016 WL 8711449, at *4 n.9 (S.D.N.Y. Aug.12,

2016), *R&R adopted by* 2017 WL 111738 (S.D.N.Y. Jan. 11, 2017); *Student X v. NYC Dep't Educ.*,

2008 WL 4890440, at *11 (E.D.N.Y. Oct. 30, 2008).[5]

Under Section 706(2)(A) of the APA, a court may set aside agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

The plaintiff bears the burden of showing that the agency's action should be set aside. *See Miezgiel*,

33 F. Supp.3d at 189 (citations omitted).

This standard of review is "extremely narrow." *Chauffeur's Training Sch. v. Spellings*, 478

F.3d 117, 130 (2d Cir. 2007) (citation omitted); *Gully v. Nat'l Credit Union Admin.,* 341 F.3d 155,

163 (2d Cir. 2003) (quoting *Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd.*, 247 F.3d

437, 441 (2d Cir. 2001)) ("Our review under these standards is narrow and 'particularly

deferential'").  An agency decision may be set aside only "if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of agency

---

[5] For this reason, USCIS does not respond to plaintiff's Statement Pursuant to Local Rule 56.1, which cites primarily to the administrative record.  The case citation cited by plaintiff in statement 5 of his 56.1 Statement – cited putatively to establish what constituted the political government of Afghanistan at one point in time  -- is not a proper basis for statements under Local Rule 56.1 inasmuch as case law does not constitute an admissible evidentiary basis for disputed facts.

expertise." *Karpova v. Snow,* 497 F.3d 262, 267 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Second Circuit has underscored that, in reviewing the agency's decision, "courts should not substitute their judgment for that of the agency." *Karpova,* 497 F.3d at 267 (citations omitted); *see also Falk v. Sec'y of the Army,* 870 F.2d 941, 945 (2d Cir. 1989) (noting that courts "may not assess the wisdom of an agency's choice."). Even if the agency's decision "is not perfectly clear," this Court will uphold that decision "so long as the agency examines the relevant data and has set out a satisfactory explanation, including a rational connection between the facts found and the choice made." *Karpova*, 497 F.3d at 268 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *Gully*, 341 F.3d at 163 (citation omitted).

## B.    USCIS Properly Denied The Adjustment Application

In USCIS's April 2016 denial of plaintiff's adjustment application, USCIS set out the requisite "rational connection between the facts found and the choice made." *Karpova,* 497 F.3d at 268. USCIS correctly noted that, in order for an asylee to be eligible to apply for adjustment to permanent residence, the alien must be admissible "at the time of examination for adjustment of such alien." AR 1 (quoting INA § 209(b)); *see* 8 U.S.C. § 1159(b)(5). USCIS found that plaintiff was inadmissible on two independent grounds, having engaged in two independent forms of terrorism-related conduct, as defined under the INA. AR 4.

### 1.    USCIS Properly Found Plaintiff Inadmissible On The First Ground

As to the first such grounds, USCIS correctly noted that an alien is inadmissible for "use of any . . . firearm, or other weapon . . . with intent to endanger, directly or indirectly, the safety of one or more individuals." 8 U.S.C. § 1182(a)(3)(B)(iii)(V). USCIS observed that, in connection with plaintiff's asylum application, the record reflects statements made in 1999 and 2000 that he had used a Kalashnikov against Massood's men, in the service of the Taliban, and that when asked

14

if he had engaged in "actual fighting," he replied in the affirmative. AR 3-4; *see* AR 158, 163. USCIS further reasoned that, when its 2013 NOID pointed out that this constituted terrorist activity, plaintiff submitted a responsive affidavit that, for the first time, asserted that he had not "intended to endanger" anyone inasmuch as he had "fired the gun at nobody." AR 3-4. USCIS found "not credible" this inconsistency between the new-minted averral that plaintiff had "fired at nobody" and plaintiff's former averrals that he had engaged in "actual fighting" and "used a gun against men." AR 3-4; *see* AR 158, 163. The change, USCIS observed, was more striking since it had only been made in response to the NOID citing the problem of using a weapon with intent, *see* AR 3, and thus appeared to be a transparent, if unavailing, maneuver to neutralize damaging testimony, *see* AR 4.

Plaintiff's counsel speculates that plaintiff's statements are not inconsistent, postulating, for example, that one can "fight" with a gun without actually shooting at an adversary by virtue of being "intimidating" or by "brandishing," "displaying, or "attempting to fire" the weapon, which plaintiff's counsel argues would negate the requisite "intent to harm individuals" that the INA requires for inadmissibility. *See* Pl. Mem. 7-8. However, plaintiff's counsel's speculations as to what may have occurred in Afghanistan in 1999 are not evidence, nor could they, in any event, constitute the evidence of record that was before USCIS when it made the decision, set forth in the administrative record. In the same vein, although plaintiff's counsel argues that plaintiff "claim[ed] to have fired his weapon in the air," Pl. Mem. 8, no citation to the administrative record is offered for this putative statement, which, indeed, appears not to be contained therein. Plaintiff's counsel's theorizing about what might have occurred on the field of battle is simply not pertinent.

Plaintiff errs to the extent that he further argues that USCIS's finding of use-of-weapon-based inadmissibility was arbitrary and capricious because the INA mandates that such use must

also either be "unlawful under the laws of the place where is committed" or "unlawful under the laws of the United States," 8 U.S.C. § 1182(a)(3)(B)(iii), and here plaintiff's military service with the Taliban effectively meant that plaintiff was lawfully using his weapon "in the service of his country." *See* Pl. Mem. 9-10. This tale of patriotism flies in the face of plaintiff's own protestations in the administrative record up until the NOID issued. Throughout the early administrative record, in seeking asylum, plaintiff had contended that he was impressed into service by an oppressive force, and required to shoot at religious persons in, what was effectively, a religious civil war between Sunni and Shia. AR 151-53, 158, 170, 185. Indeed, he argued that his impressment was of a piece with other forms of religiously motivated oppression he claims to have experienced as a Shiite under the Taliban regime. *See id.* In fact, this was the very basis under which he argued he should be awarded asylee status. Plaintiff's current contention that he was fulfilling a patriotic duty by aiding the Taliban cannot be squared with the asylum status that is a predicate for seeking the instant status-adjustment.

In any event, there is no circumstance under which it would be lawful "under the laws of the United States" for one group of militants (or for the local or federal government) to militarily oppress religious persons, let alone to do so in favor of adherents of yet another religion. Thus, plaintiff's bland assertion that fighting for the Taliban against its enemies would not have been unlawful under the laws of the United States, but rather constituted patriotic "service to his country," in the best military tradition of the United States, is incorrect.

Moreover, even had he in fact believed that he was legitimately taking sides in the civil strife in his country, this would not be enough to establish that his conduct would not have been unlawful. *See In re S-K*, 23 I & N Dec. 936, 941 (BIA 2006) ("[W]e find that Congress intentionally drafted the terrorist bars to relief very broadly, to include even those people described

as 'freedom fighters,' and it did not intend to give us discretion to create exceptions for members of organizations to which our Government might be sympathetic . . . there is no exception in the Act to the bar to relief in in cases involving the use of justifiable force to repel attacks by forces of an illegitimate regime."); *Khan v. Holder,* 584 F.3d 773, 781 (9th Cir. 2009) (rejecting plaintiff's argument that terrorist activity was not "unlawful" within the meaning of the INA because it was "legitimate armed resistance against military targets"); *McAllister v. AG,* 444 F.3d 178, 187-88 (3d Cir. 2006) (finding that terrorist-activity-based inadmissibility owing to violence does not distinguish between purposes of resistance groups, and whether non-combatants are targeted).[6]

In sum, USCIS offered a reasoned application of the law to the evidence in the administrative record, in finding that plaintiff was inadmissible for "use of a weapon," and thus ineligible for status-adjustment and the attendant benefits of naturalization as a U.S. Citizen. Though plaintiff argues that USCIS acted arbitrarily and capriciously by declaring these statements inconsistent, he errs, as set forth above. Moreover, even were it true that USCIS's decision were "not perfectly clear" -- which is not the case -- even then, under the deferential standard of APA review afforded agency decisions, the Second Circuit requires that the agency decision be upheld where, as set forth above, the agency has identified "a rational connection between the facts found and the choice made." *Karpova*, 497 F.3d at 268. Accordingly, the Court should decline to disturb USCIS's determination denying status-adjustment for this reason alone.

### 2. USCIS Properly Found Plaintiff Inadmissible On The Second, Wholly Independent, Ground

---

[6] To the extent that plaintiff cites case law purporting to establish as a political fact what entity governed Afghanistan in 2001, *see* Pl. Mem. 10, not only is case law not a legitimate source of judicial notice of, or way to establish, geopolitical facts, but also the case law is irrelevant, inasmuch as plaintiff's citation does not refer to the events in Afghanistan applicable here, which date to 1999.

Moreover, even assuming, *arguendo*, that plaintiff were not inadmissible on use-of-a-weapon grounds, USCIS correctly found plaintiff inadmissible on separate, independent, terrorism-related grounds.

Specifically, USCIS correctly stated that "terrorist activity" is also defined in the INA as "an act that the actor knows, or reasonably should know, affords material support" to a "terrorist organization," including Tier I terrorist organizations, described in 8 U.S.C. § 1182(a)(3)(B)(vi)(I) -- or as the statute puts it "subclause (I)" of "clause (vi)." AR 23 (citing 8 U.S.C. 1182(a)(3)(B)(iv)(VI)(cc)). As USCIS also correctly noted, sections 691(d) and (f) of the CAA designated the Taliban a Tier I terrorist organization, and made that designation retroactive.[7] AR 2. USCIS also correctly noted that "material support" has been found even the support does not relate to the organization's terrorist actions. AR 2. USCIS reasoned that plaintiff's own statements reflect repeatedly that, for 25 days, he had cooked, washed, and cleaned for the Taliban. AR 2-4. USCIS concluded that this constituted material support for the Taliban. AR 2-4.

Plaintiff argues that, because under the material support provision, the person must putatively "know, or reasonably should know" that he is providing material support to a terrorist organization, and Congress promulgated the Tier I designation in 2007, making it retroactive,

---

[7] To the extent that plaintiff argues that, unlike the CAA, earlier emendations to the terrorist-activity inadmissibility grounds had more limited retroactivity provisions, *see* Pl. Mem. 11-13, the argument is a red herring. The relevant provision here is not the earlier emendations but rather the most recent legislative enactment, the CAA, which has its own retroactivity provision, at 691(f), that makes very clear that its designation of the Taliban as a Tier I terrorist organization is retroactive. Plaintiff's further argument that retroactivity can create difficulties by scooping in large swathes of the populace which may have interacted with any given organization retroactively designated "Tier I," *see* Pl. Mem. 20-22, is also a red herring. It is self-evident that making conduct unlawful/punishable retroactively sweeps in conduct that a person seeking to follow the law at the time might otherwise have avoided. Nevertheless, Congress chose, as a policy matter, to proceed by enacting a provision making material support of the Taliban retroactively disallowed. Plaintiff's personal view as to the unfairness of Congress's studied choice has no bearing of the existence of the retroactivity.

plaintiff could not have reasonably known back in 1999 that he was supporting what would one day be designated a Tier I terrorist organization. *See* Pl. Mem. 14-15.

This argument is unavailing. As the Second Circuit has explicitly explained, the knowledge portion of the statute pertains not to the *nature* of the organization being supported -- whether terrorist-organization designated, for example -- but to the fact of the act -- that one is contributing to a *specific* organization. As the Second Circuit has made clear, "[W]e are persuaded" that comparisons between clauses under § 1182(a)(3)(B)(iv) "powerfully indicated that the first knowledge component of clause (VI) requires only knowledge that the alien knew he was rendering material support to the recipient of his support." *See American Acad. of Religion v. Napolitano*, 573 F.3d 115, 131 (2d Cir. 2009). Plaintiff does not dispute that he knew he was cooking and cleaning for the the Taliban. Indeed, he could not credibly do so, since his asylum application is based on allegations that the Taliban oppressed him by forcibly drafting him and requiring him to cook and clean for the Taliban.

Plaintiff further argues that cooking and cleaning could not constitute "material support" within the meaning of the INA because they were not "relevant to terrorism," unlike the examples of material support delineated in the statute itself. *See* Pl. Mem. 15-20. This argument, too, is without merit. In *S-K*, 23 I & N Dec. 936, the BIA expressly held exactly the opposite: "We reject the respondent's assertion that there must be a link between the provision of material support to a terrorist organization and the intended use by that recipient organization of the assistance to further a terrorist activity." *See id.* at 944. As the BIA explained, "promotion of terrorism" would be a most short-sighted and ineffective limitation on such support, in that it would enable a terrorist organization to solicit aid "for an ostensibly benign purpose" as to its organization, and then shift

its newly freed up resources in order "to promote its terrorist activities." *Id.* It is a zero sum game: if a terrorist group need not pay for housekeeping, it can spend more on howitzers.

In part for this reason, it is well settled that "material support" is not limited to the examples enumerated in 8 U.S.C. § 1182(a)(3)(B)(iv)(VI), but rather includes such seemingly minimal forms of aid as "provision of food and setting up tents." *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 299 (3d Cir. 2004); *see also Annachemy v. Holder,* 733 F.3d 254, 257, 259 (9th Cir. 2013) (overruled on other grounds, *Abdisalan v. Holder*, 774 F.3d 517 (9th Cir. 2014)) (finding material support where plaintiff had been "forced to cook, dig trenches, fill sandbags, and help build fences");  *S-K*, 23 I & N Dec. at 945 ("As DHS contends, it is certainly plausible . . . that the list in section 212(a)(3)(B) was intended to have an expanded reach and cover virtually all forms of assistance . . . Congress has not expressly indicated its intent to provide an exception for contributions which are de minimis.").[8]

Therefore, on this independent inadmissibility ground, too, USCIS identified "a rational connection between the facts found and the choice made" and properly found plaintiff inadmissible for purposes of adjustment of status. *Karpova*, 497 F.3d at 268. Accordingly, for this reason, too, the Court should decline to disturb USCIS's determination denying adjustment of status.

## C.    USCIS Is Not Precluded From Denying The Adjustment Application On The Grounds Of Terrorism-Related Inadmissibility

Plaintiff incorrectly argues that res judicata precludes USCIS from finding him inadmissible (and thus ineligible for adjustment of status) on the first inadmissibility grounds --

---

[8] Plaintiff's further argument that cooking and cleaning does not violate U.S. law, *see* Pl. Mem. 14, misconstrues the INA provisions.  The provision regarding whether the putative terrorist activity would have been unlawful under the laws of the United States applies, by the plain language of the statute, to conduct pursuant to the subsections of 8 U.S.C. § 1182(a)(3)(B)(iii), not to the "material support" ground, which is pursuant to subclause (V) of 8 U.S.C. § 1182(a)(3)(B)(iv).

"use of a weapon." Pl. Mem. 4-6. Plaintiff contends, essentially, that the asylum award required assessing plaintiff's inadmissibility under the terrorist-activity provisions, that there has been no material change in the law as to the "use of a weapon" terrorist-activity provision, and that the relevant facts about plaintiff's use of a weapon were known prior to the asylum determination. *See* Pl. Mem. 5-6. Plaintiff further reasons that USCIS is now barred by res judicata from finding inadmissibility based on "use of a weapon" in the status-adjustment application, as the government raised or could have raised this inadmissibility argument before the immigration judge during the asylum hearing, and the immigration judge, by granting asylum, implicitly found plaintiff admissible. *See id.*

This argument is unavailing. As an initial matter, taken to its logical conclusion, plaintiff is arguing that the government cannot prevent a terrorist from becoming a legal permanent resident if it mistakenly failed to raise the terrorism-related inadmissibility grounds during the course of an asylum hearing. By plaintiff's argument, USCIS, would be precluded from correcting that error when making its separate determination as to whether the terrorist-asylee is eligible to obtain permanent residence were USCIS to catch the error at the later adjustment-of-status-to-permanent-resident stage.

That argument seems illogical on its face, but especially so since the INA specifically and expressly *requires* a finding of inadmissibility "at the time of examination for adjustment." *See* 8 U.S.C. § 1159(b)(5). The plain meaning of those words is that the government is, at a minimum, not precluded from making – and indeed mandated to make -- inadmissibility determinations contemporaneous with an application for adjustment of status, irrespective of whether such determinations could have been made previously. Notably, the language requiring contemporaneous assessment in the INA does *not* limit the assessment required "at the time of

examination for adjustment" to newly discovered facts or to alterations in the legal definition of terrorism activity; there is no statutory caveat. *See* 8 U.S.C. § 1159(b)(5). Moreover, USCIS is not permitted to waive terrorism-related inadmissibility grounds in determining whether to adjust the status of an asylee. *See* 8 U.S.C. § 1159(c).

In any event, plaintiff's premise is inherently faulty. Plaintiff's argument that admissibility on "use of weapon" grounds could have been raised in the asylum proceeding, and thus res judicata precludes plaintiff from raising inadmissibility on the same grounds during the status-adjustment phase, rests on the assumption that res judicata applies to administrative proceedings such as these. However, the very case that plaintiff cites, *Channer v. DHS,* 527 F.3d 275 (2d Cir. 2008), *see* Pl. Mem. 5, leaves open the possibility that res judicata does *not* in fact apply to immigration proceedings, which are administrative. The Second Circuit in *Channer* cautioned that "the question is not whether administrative estoppel is wise but whether it is intended by the legislature," that is, "[w]hether it would be consistent with Congress's statutory scheme to apply res judicata and bar DHS from lodging different grounds of removal in successive immigration proceedings." *Channer,* 527 F.3d at 280 (citations omitted). Although the Second Circuit declined to issue a holding, "express[ing] no view on the applicability of res judicata in this context," (ultimately holding that, in any event, even were res judicata to apply, it would not bar the government's action), the Second Circuit clarified that:

> [A] determination of whether res judicata applies in the immigration context should be guided by the view that a doctrine should not be applied so as to frustrate clearly expressed congressional intent. We note that Channer falls into the category of aliens whom Congress repeatedly and unambiguously has sought to remove: aliens convicted of aggravated felonies.

*Channer*, 527 F.3d at 280 n.4 (citations omitted).

Here, as in *Channer,* res judicata should not be applied in the immigration context "so as to frustrate clearly expressed congressional intent." *Id.* Here as in *Channer,* the plaintiff "falls into

a category of aliens whom Congress repeatedly and unambiguously has sought to remove." *Id.* Here, that "category of aliens" is that of aliens who have had affiliation with terrorist activities as defined by Congress. The repeated efforts, set forth above, in the USA PATRIOT Act, the REAL ID Act, and the CAA, to expand the boundaries of inadmissibility in various ways relating to terrorism-activity mark Congress's "repeated and unambiguous" efforts to rid the applicant pool of those with terror affiliations. Further evidence of Congressional intent toward that end is that, as noted above, Congress specifically set forth in the status-adjustment statute that admissibility must be assessed "*at the time of* examination for adjustment of such alien." 8 U.S.C. § 1159(b)(5) (emphasis added). Therefore, here as in *Channer*, res judicata "should not be applied so as to frustrate clearly expressed congressional intent," *id.*, by precluding USCIS at the status-adjustment stage from applying the INA to evaluate plaintiff's inadmissibility on terrorism-based grounds.

Moreover, even were res judicata to apply, that doctrine would not preclude an inadmissibility determination here. In the immigration context, the Second Circuit in *Channer* found that same nucleus of operative fact (required for res judicata) was missing in the second removal proceeding, where there was more than one factual predicate for removal, even though the facts essential to *both* such predicates were known at the time of the first proceeding. *See* 527 F.3d at 281. Thus, the government's failure to make an argument in a previous removal proceeding, despite the government's ability to make that argument, did not bar the government from mounting the argument in a later removal proceeding. Similarly, in *Stephenson v. Lynch*, 634 F. App'x 328 (2d Cir. 2016), an alien argued that res judicata and collateral estoppel precluded DHS from lodging charges of removability against him based on his 2009 robbery conviction, where DHS had earlier attempted to remove him relying on other, earlier convictions. There, as here, the alien argued that DHS *could have* raised the 2009 robbery conviction in the original removal proceeding,

but failed to do so. *See Stephenson*, 34 F. App'x at 329. There, as here, the alien argued that, as a result, preclusion doctrines barred DHS from taking a second crack. *See id.* The Second Circuit disagreed with the alien, holding that DHS was *not* precluded from initiated a second removal proceeding, "*irrespective* of whether the charge could have been raised in an earlier proceeding." *Id.* (emphasis added). Here, as in *Stephenson,* the fact that the government *could have* argued terrorism-related inadmissibility in connection with the asylum hearing does not preclude the government from making an inadmissibility determination in connection with a later administrative process: the application for adjustment of status.[9]

Notably, the government does not concede – and vigorously contests -- that the March 2000 asylum hearing at which asylum was granted addressed, let alone actually litigated, terrorism-based inadmissibility. Indeed, the NTA requiring plaintiff to appear at the proceedings where his asylum claim was addressed, AR 176, did not raise terrorism-related grounds of inadmissibility, only inadmissibility owing to lack of proper entry documents. To the extent that the matter of plaintiff's army service with the Taliban appears in the record prior to the grant of asylum-- as reflected by such exemplars as his affidavit submitted in support of his asylum claim, and his statements at the airport raising intent to seek asylum, AR 158, 170, 185 -- he cites his impressment by the Taliban in the context, generally, of providing further evidence of his credible fear of persecution by the Taliban, not in the context of assessing terrorism-based inadmissibility. Furthermore, the order by the immigration judge granting asylum only notes that asylum was granted, and does not discuss any reasons or findings or what was argued. AR 87. In sum, the

---

[9] Indeed, here there is even less reason to apply res judicata than in *Stephenson*, given that, here, the later administrative process – plaintiff's application for adjustment of status -- was not in the context of a removal proceeding, unlike the earlier one, and for that reason alone different factual determinations, legal issues, and benefits were at stake.

record contravenes -- and at a minimum does not support -- that plaintiff's inadmissibility on terrorist-activity grounds was actually litigated at the asylum stage.

Finally, even were the Court to find estoppel as to the "use of a weapon" inadmissibility grounds, that still leaves the wholly independent second ground for inadmissibility – "material support." Even plaintiff does not (nor indeed could he credibly) contend that this second ground is subject to preclusion doctrines. As plaintiff himself concedes, there has been a change in the law since his asylum was granted as to the "material support" grounds, inasmuch as the Taliban became, in 2007, retroactively designated a "Tier I" organization, newly rendering applicable material support inadmissibility grounds under 8 U.S.C. § 1158(a)(3)(B)(iv)(V)(cc). Pl. Mem. 11. Thus, even plaintiff does not argue that the government is estopped from finding plaintiff inadmissible on "material support" grounds, nor could he credibly do so.

In sum, USCIS is not estopped from – and indeed is statutorily enjoined to -- evaluate plaintiff's inadmissibility for use of a weapon "at the time of examination for adjustment," but if USCIS were estopped, plaintiff would still be inadmissible on "material support" grounds, as to which plaintiff makes no such argument.

## CONCLUSION

For the foregoing reasons, USCIS respectfully requests that the Court: (i) grant its cross-motion for summary judgment, affirming USCIS's decision, and dismiss this action with prejudice; (ii) deny plaintiff's motion for summary judgment; and (iii) grant such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
      September 13, 2017

BRIDGET M. RODHE
Acting United States Attorney
*Counsel for Defendant*
Eastern District of New York
271 Cadman Plaza East, 7th Fl.
Brooklyn, New York 11201

By:    /s/ Layaliza Soloveichik    
LAYALIZA SOLOVEICHIK
Assistant United States Attorney
(718) 254-6298
layaliza.soloveichik@usdoj.gov