Michael E. Piston
Attorney for the Plaintiff
225 Broadway Ste 307
New York, NY 10007
Phone 646-845-9895
Fax 206-770-6350



# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOHAMED QASEEM KAKAR,<br><br>Plaintiff,<br><br>    vs.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES<br><br>Defendant. | Case No.: 1-16-cv-05032-KAM<br><br>PLAINTIFF'S OPPOSITION AND REPLY TO THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF  DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT  AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br><br>JUDGE KIYO A. MATSUMOTO |

Mohamed Qaseem Kakar opposes and replies to the government's

Memorandum of Law in Support of  Defendant's Cross-Motion For Summary

Judgment  and in Opposition to Plaintiff's Motion For Summary Judgment (Gov't

memo)  as follows:


I.   THE FINDING THAT MR. KAKAR IS INADMISSIBLE ON ACCOUNT
     OF ENGAGING IN "TERRORIST" ACTIVITIES AS DEFINED BY §
     1182(a)(3)(B)(iii)(V) IS BARRED BY COLLATERAL ESTOPPEL

(Memorandum Of Fact and Law in Support of Plaintiff's Motion For Summary
Judgment [Kakar's Memo] at 4-6 ; Gov't Memo at 20-25)

As the government notes, Mr. Kakar's application for adjustment of status

was denied because he was found to be inadmissible on two grounds: 1) 8 U.S.C.

1182(a)(3)(B)(iii)(V) for engaging in "terrorist" [1]  activities; and 2) 8 U.S.C.

1182(a)(3)(B)(iv)(VI)(cc) for having provided material support to the Taliban, a

Tier 1 terrorist organization. As Mr. Kakar demonstrated in his opening brief, the

first of these charges, engaging in "terrorist" activities is, despite the denials by the

government, barred by collateral estoppel.[2,3]

---

[1] Mr. Kakar will place in quotation marks the word terrorist as it relates to
activities since the use of that word in that section is so far removed from its
ordinary meaning as to in fact make it a different word altogether. See, e.g., the
Merriman-Webster Online Dictionary, defining terrorism as "the systematic use
of terror especially as a means of coercion". https://www.merriam-
webster.com/dictionary/terrorism (last accessed 10/7/2017). He will not
however place it quotations when referring to organizations, the reference to
which appear closer to word's ordinary meaning.

[2] Mr. Kakar inadvertently  mislabeled the doctrine he was referring to in his
opening memo as "res judicata".  That is incorrect and he regrets the error.

[3] Mr. Kakar has never claimed that the second charge is barred by res
judicata or collateral estoppel.

A. COLLATERAL ESTOPPEL APPLIES TO BAR READJUDICATION OF MR. KAKAR'S "TERRORISM" INADMISSIBILITY IN ADJUSTMENT OF STATUS PROCEEDINGS

1.  *This Court should defer to the BIA's holding that collateral estoppel applies to administrative proceedings under the INA*

The Board of Immigration Appeals (BIA or Board) has expressly found collateral estoppel applicable to proceedings under the Immigration and Nationality Act. *Matter of Fedorenko*, 19 I. & N. Dec. 57, 61-62 (BIA 1984).[4] In *Fedorenko*, the Board held that the respondent was collaterally estopped from challenging in deportation proceedings issues which were necessarily decided in his prior denaturalization case. The Board held that:

> The judicially-developed doctrine of collateral estoppel, which is related to the doctrine of res judicata, precludes parties to a judgment on the merits in a prior suit from relitigating in a subsequent action issues that were actually litigated and necessary to the outcome of the prior suit. … . In order for collateral estoppel to be invoked in a given case, there must have been a prior judgment between the parties that is sufficiently firm to be accorded conclusive effect and the parties must have had a full and fair opportunity to litigate the issues in the prior suit. … In addition, the use of collateral estoppel must not be unfair to the parties.

*Fedorenko*, 19 I & N Dec. at 61. (citations omitted).

The Board found these prerequisites for collateral estoppel to be satisfied in *Fedorenko*:

> The Supreme Court's judgment in the denaturalization proceeding is a final judgment. Thus, it is fair to accord the judgment conclusive effect. The respondent and the United States, who were the parties in the denaturalization proceeding, are also the parties in this deportation proceeding. See Matter of McMullen, supra, at 548. Both the respondent and the Government had a "full and fair opportunity" to litigate the material

---

[4] BIA published decisions are binding on USCIS. 8 C.F.R. **1003.1(g).**

issues resolved by the denaturalization judgment there were no procedural limitations to full presentation of the issues and the parties obtained a thorough appellate review of the judgment. In addition, the Government's burden of persuasion in the denaturalization proceeding was the same as its burden in this proceeding. *See Woodby v. INS*, 385 U.S. 276, 285-86 (1966). Lastly, it is fair to apply collateral estoppel because both the respondent and the Government reasonably could have foreseen that issues raised in the denaturalization proceeding might be raised in a subsequent deportation proceeding. Since the general prerequisites have been met, we conclude that it is appropriate to apply the doctrine of collateral estoppel in this case.

*Id.* at 61-62.

Here likewise both Mr. Kakar and the USCIS were parties to a judgment on the merits in Mr. Kakar's removal proceeding, Mr. Kakar directly and the USCIS by virtue of its position as the successor of the Immigration and Naturalization Service (INS). Therefore they are precluded from relitigating in Mr. Kakar's adjustment of status proceedings the issue of his inadmissibility under 8 U.S.C. 1182(a)(3)(B)(iii)(V). The Immigration Judge, by granting Mr. Kakar's application for asylum, actually litigated his inadmissibility under this section, because if he was inadmissible under that section he would be ineligible for asylum[5]. See

---

[5] "(T)he government does not concede – and vigorously contests -- that the March 2000 asylum hearing at which asylum was granted addressed, let alone actually litigated, terrorism-based inadmissibility." Gov't memo at 24. "The prior decision of the issue need not have been explicit, however, 'if by necessary implication it is contained in that which has been explicitly decided.' *Norris v. Grosvenor Marketing Ltd.*, 803 F.2d 1281, 1285 (2d Cir. 1986) (internal quotation marks omitted). If the decision was implicitly necessary, 'it will be the basis for collateral estoppel.' *Id*. (internal quotation marks omitted). *Postlewaite v. McGraw-Hill, Inc.*, 333 F.3d 42, 48 (2d Cir. 2003). The finding that Mr. Kakar was not inadmissible on "terrorism" grounds was expressly necessary for him to be granted asylum. 8 U.S.C. 1158(b)(2)(A)(v)(2000).
*Continued on the bottom of the following page*

generally Kakar's memo at 4-5. Further, inasmuch as the Immigration Judge's decision granting Mr. Kakar asylum was not appealed by the INS, it is a final order, and so sufficiently firm to be accorded conclusive effect.

Certainly the parties both had a full and fair opportunity to litigate the issue of Mr. Kakar's inadmissibility on "terrorism" grounds in that there were no procedural limitations to full presentation of the issues and the parties had the right to a thorough appellate review of the order, although neither of them chose to exercise it. In addition, Mr. Kakar's burden of persuasion of proving he was not inadmissible in asylum proceedings was the same as his burden of proving inadmissibility in adjustment of status proceedings, in that in both cases that burden was as set forth in 8 U.S.C. 1229a(c)(2)(A), which has not changed since Mr. Kakar was granted asylum in 2000. Finally, the use of collateral estoppel is not unfair to the parties because both Mr. Kakar and the INS reasonably could have foreseen that issues raised in the asylum proceeding might be raised in a subsequent adjustment proceeding since both were represented by competent counsel who were presumably aware that the legal standards for deciding whether "terrorism" inadmissibility applied were identical in both cases.

The federal courts defer to precedent decisions of the Board of Immigration Appeals interpreting the Immigration and Nationality Act unless the Act

unambiguously prohibits it, or it is not a permissive interpretation of the same. *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 842-43 (1984).

Accordingly, applying the principles set down by the BIA in *Fedorenko*, this Court should conclude that it is appropriate to apply the doctrine of collateral estoppel to bar the readjudication of Mr. Kakar's "terrorism" inadmissibility in connection with his application for adjustment of status.

     a.  Neither the Second Circuit's decision in *Channer* nor *Stephenson* apply here

In opposing the application of issue preclusion, the government claims that *Channer v. DHS,* 527 F.3d 275 (2d Cir. 2008), "leaves open the possibility that res judicata does *not* in fact apply to immigration  proceedings, which are administrative." Gov't Memo at 22. However, in fact *Channer* expressly recognizes that "(t)he BIA already has determined that it will apply preclusion principles in immigration proceedings. *Matter of Fedorenko*, 19 I. & N. Dec. 57, 61 (BIA 1984)." *Channer*, 527 F.3d at 280. *Channer* was bound by the BIA's holding (as are all courts) unless the Act unambiguously prohibits it, or it is not a permissive interpretation of the same. *Chevron,supra*. Presumably this is what the *Channer* court was referring to when it commented that  "(w)hether it would be consistent with Congress's statutory scheme to apply res judicata and bar the DHS from lodging additional grounds of removal in successive immigration proceedings indeed may be a difficult question." *Channer*, 527 F.3d at 280. In any event,

*Channer* made no finding that *Fedorenko* was not entitled to *Chevron* deference, and so its musings on this topic were merely *dicta*.

> The actual bases for the decision in *Channer* was the requirement that:
>
> (i)n deciding whether a suit is barred by res judicata, [i]t must first be determined that the second suit involves the same 'claim' or -- nucleus of operative fact -- as the first suit.  Three indicia determine whether the second suit involves the same claim or nucleus of operative fact as the first: (1) whether the underlying facts are related in time, space, origin, or motivation;( 2) whether the underlying facts form a convenient trial unit; and (3) whether their treatment as a unit conforms to the parties' expectations. *Id*. (internal quotation marks omitted). [T]he facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit. It is instead enough that 'the facts essential to the second were [already] present in the first.
>
> *Channer*, 527 F.3d at 280-281 (citations and internal quotations omitted).

Even assuming that *Channer* had the authority to modify the collateral estoppel doctrine set forth in *Fedorenko* without first performing a *Chevron* analysis, the fact is that the instant matter fully satisfies the modified test. The question of whether Mr. Kakar may be denied adjustment of status on "terrorism" grounds certainly involves the same nucleus of operative facts as whether he could be granted asylum. The underlying facts were obviously related in time, space, origin, or motivation – the USCIS found Mr. Kakar to have engaged in "terrorism" for the exact same reason he was granted asylum – the fact that he was drafted into, and forced to fight for, the Taliban controlled Afghan army. For the same reason the underlying facts form a convenient trial unit; they were indeed the very same facts. Finally, as discussed above, the treatment of those facts as a unit conforms to the parties' expectations, since, again, both were represented by competent counsel

who must be presumed to know that the test for denying asylum and adjustment of status on "terrorism" grounds were exactly the same. Accordingly, since all of the facts which resulted in the denial of Mr. Kakar's application for adjustment of status were introduced in his asylum proceedings, Certified Administrative Record (CAR) at 2-4, the facts essential to his second adjudication were indeed already present in his first, and he fully satisfies *Channer's* "nucleus of operative facts" test. Finally, inasmuch as the 2nd Circuit's unpublished decision in *Stephenson v. Lynch*, 634 F. App'x 328 (2d Cir. 2016), was based entirely on *Channer*, *Stephenson,* 634 F. App'x at 329, the government's reliance upon it is misplaced as well.

      b.  Neither of the Exceptions to *Chevron* are Applicable Here

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for  the court,    as well as the agency, must give effect to the unambiguously expressed intent of Congress.   If, however,  the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 at 842-843.

> i.  It is presumed that Congress intended collateral estoppel to apply to asylee adjustment of status proceedings.

While Congress has not directly spoken to the precise question of whether collateral estoppel applies to asylee adjustment of status proceeding, "Congress is understood to legislate against a background of common-law adjudicatory  principles." *Astoria Fed. Sav. & Loan Ass'n. v. Solimino*, 501 U.S. 104, 108 (1991). Accordingly, the Supreme Court has held that there is a presumption that Congress intended for well-established common-law principles, such as collateral estoppel, to apply to the decisions of administrative agencies. *Id.* ("[W]here a common-law principle is well established, as are the rules of preclusion, the courts may take it as given that Congress has legislated with an expectation that the principle will apply") (citations omitted); *see also Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986) ("We have previously recognized that it is sound policy to apply principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity.").

Nevertheless, the government maintains that "'the INA specifically and expressly *requires* a finding of inadmissibility 'at the time of examination for adjustment.' *See* 8  U.S.C.  1159(b)(5)." Gov't Memo at 21. The claim that this two-step inquiry overcomes the presumption that Congress intends collateral

estoppel to apply to administrative proceedings has been rejected by all five courts

that have considered it - including Fifth Circuit Court of Appeals - and with good

reason as will now be shown. As one of these courts disposes of this argument

exceptionally well, it will be quoted from at length:[6]

> The Court recognizes that "the INA envisions a two-step inquiry whereby an
> applicant's admissibility to the United States is evaluated both when they
> apply for asylum and when they apply for permanent residency." *Khan*,
> 2016 U.S. Dist. LEXIS 13285, 2016 WL 429672, at *6. However, the Court
> also agrees with the court in *Khan*, which concluded the following: "that
> Congress intended for applicants to be evaluated twice does not, in and of
> itself, suggest that Congress intended to bar the application of collateral
> estoppel—particularly given that there is a presumption that collateral
> estoppel *should* apply to the decisions of administrative agencies." *Id.*
> Further, "the purpose of having a two-step inquiry is not to give the
> government two bites at the apple." 2016 U.S. Dist. LEXIS 13285, [WL] at
> *7. Rather, "the purpose of the second inquiry is to evaluate  any new
> circumstances that may have arisen or any new facts that have come to light
> during the one year period applicants are required to wait between when
> they are granted asylum and when they apply for permanent
> residency." *Id.*; *see also Islam v. U.S. Dep't of Homeland Sec.*, No. 14-CV-
> 05326-RS, 136 F. Supp. 3d 1088, 2015 U.S. Dist. LEXIS 129538, 2015 WL
> 5653548, at *5 (N.D. Cal. Sept. 25, 2015). ("[T]he two-step process is not
> indicative of the legislative intent to bar collateral estoppel. . . . "The one
> year wait time is a trial period to allow the government to assess how an
> asylee adjusts to the United States. The second step is to evaluate any new
> information or problems that may have arisen in that year."). Thus, "were
> new circumstances to arise during the year after [Aldarwich] was granted
> asylum, USCIS could consider those circumstances in ruling on his
> application for permanent residency." *Khan*, 2016 U.S. Dist. LEXIS 13285,
> 2016 WL 429672, at *7; *see also Islam*, 2015 U.S. Dist. LEXIS 129538,
> 2015 WL 5653548, at *5. For example, "if new evidence were to come to

---

[6] The other four decisions, all referred to in the following excerpt, are
*Amrollah v. Napolitano,* 710 F.3d 568 (5th Cir. 2013), *Khan v. Johnson*, 160 F.
Supp. 3d 1199 (C.D. Cal. 2016), *Islam v. United States Dep't of Homeland Sec.*,
136 F. Supp. 3d 1088 (N.D. Cal. 2015) and *Sile v.Napolitano*, 2010 U.S. Dist.
LEXIS 46406 (N.D. Ill. May 12, 2010).

light regarding [Aldarwich's] involvement with the [Southern Lebanese Army]" and his purported involvement with terrorist activities, "USCIS might have cause to reevaluate [Aldarwich's] admissibility." *Khan*, 2016 U.S. Dist. LEXIS 13285, 2016 WL 429672, at *7; *see also Islam*, 2015 U.S. Dist. LEXIS 129538, 2015 WL 5653548, at *5 ("Defendant's interpretation of the phrase 'at the time' in 8 U.S.C. § 1159(b)(5) as reflecting Congress's intent to foreclose collateral estoppel is unwarranted. As plaintiff points out, a change in  facts or circumstances would make it necessary for a judge to reevaluate an asylee's admissibility at the time of examination for adjustment. For example, if new facts arose that were not known to the IJ in Islam's asylum proceeding about his involvement in terrorist activities, then it would be necessary to reevaluate his admissibility under § 1182(a).").

However, in cases like this, where there were no new allegations of involvement in terrorist activity after Aldarwich's asylum application was granted, "permitting the same issue to be adjudicated twice would only cause inefficiency and potentially result in inconsistent decisions." *Khan*, 2016 U.S. Dist. LEXIS 13285, 2016 WL 429672, at *7. These are the exact harms collateral estoppel is intended to prevent — wasted judicial resources, unfairness to parties who have already fully litigated in issue, and inconsistent decisions. *Id.*; *see also Islam*, 2015 U.S. Dist. LEXIS 129538, 2015 WL 5653548, at *5.

In addition, as the *Khan* court noted:

Defendant['s] argument is also undermined by the fact that USCIS's evaluation of an application for adjustment of status involves a number of bars to admissibility that do not apply when an application applies for asylum. Specifically, section 1158—which governs applications for asylum—contains six statutory bars for which an IJ must deny an application for asylum. These include: (1) the alien has participated in the persecution of any person; (2) if the alien has been convicted of a particularly serious crime; (3) if there are reasons for believing that the alien has committed a serious nonpolitical crime outside the United States; (4) if there are reasonable grounds for regarding the alien as a danger to the security of the United States; (5) if the alien has engaged in terrorist activity; and (6) if the alien was firmly resettled in another country prior to arriving in the United States. 8 U.S.C. § 1158(b)(2)(A)(i)—(vi).

By contrast, section 1158—which governs applications for adjustment of status—incorporates section 1182, which is the INA's general provision regarding the classes of aliens who are ineligible for visas or admission to the United States. 8 U.S.C. § 1159(c). Section 1182 sets forth multiple expansive categories under which an alien may be deemed inadmissible to the United States. These categories include, *inter alia*, health-related grounds, criminal-related grounds, persons who are likely to become a public charge, and a host of "miscellaneous" grounds. 8 U.S.C. §

1182(a)(1)—(10). Notably, for purposes of this action, under section 1182, "terrorist activities" is listed as only one basis for inadmissibility within the broader category of "Security and related grounds." Id. § 1182(a)(3)(B). While none of these grounds are implicated in the instant case, theoretically, USCIS can consider each of these additional bars to admissibility when an applicant applies for an adjustment of statu[s].

Accordingly, the INA envisions a much more expansive inquiry when an applicant applies for an adjustment of status to permanent resident. Thus, even if the IJ's findings during the asylum proceedings are given preclusive effect, that does not defeat the purpose of the two-step inquiry because USCIS can still consider the numerous other grounds for admissibility that do not apply when an applicant applies for asylum. And, as already stated, USCIS can consider whether any new circumstances

Finally, in addition to the courts in *Khan* court and *Islam*, other courts outside of this Circuit have also applied principles of collateral estoppel to administrative decisions under § 1158 and § 1159. For example, in *Amrollah v. Napolitano*, the Fifth Circuit applied collateral estoppel and held the IJ's decision to grant the plaintiff's asylum application precluded USCIS from denying the plaintiff's adjustment-of-status application on the grounds that the plaintiff engaged in terrorist activities. 710 F.3d 568, 571-72 (5th Cir. 2013); *and Sile v.Napolitano*, No. 09C5053, 2010 U.S. Dist. LEXIS 46406, 2010 WL 1912645, at *4 (N.D. Ill. May 12, 2010).

*Aldarwich v. Hazuda*, 2016 U.S. Dist. LEXIS 35616, at *20-27 (C.D. Cal. Mar. 18, 2016)

ii. For the same reasons as set forth above, if the INA is ambiguous, then the BIA's interpretation of it to permit collateral estoppel according to the rules set forth in *Fedorenko* is permissible.

Accordingly, inasmuch as Mr. Kakar has satisfied all requirements for the application of collateral estoppel in this matter, the USCIS should be estopped from finding that he is inadmissible as a person who has engaged in "terrorist" activities

II. BECAUSE THERE IS NO EVIDENCE IN THE RECORD THAT MR. KAKAR USED A FIREARM WITH INTENT TO ENDANGER, DIRECTLY OR INDIRECTLY, THE SAFETY OF ONE OR MORE INDIVIDUALS OR TO CAUSE SUBSTANTIAL DAMAGE TO PROPERTY, THE FINDING THAT MR. KAKAR IS INADMISSIBLE ON ACCOUNT OF COMMITTING "TERRORIST" ACTIVITIES AS DEFINED BY 1182(a)(3)(B)(iii)(V) IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

(Kakar's Memo at 6-9; Gov't Memo at 14-15)

8 U.S.C.  1182(a)(3)(b)(iii)(v)  defines in material part "(t)errorist activity" as "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

    ♪     (V)  The use of any--
      …
              (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),
          with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

Mr. Kakar does not deny "using" a firearm after having been forced into the Afghan Army, however, there is no evidence in the record that he used it with the requisite intent. Not only did the government fail in its response to identify any portion of the record showing that Mr. Kakar had such intent but it does not even dispute that the record is in fact silent in this regard. Therefore the government has conceded that there is no evidence in the record of Mr. Kakar's intent in using a firearm.

Accordingly, the finding that Mr. Kakar is inadmissible on account of committing "terrorist" activities as defined by section 1182(a)(3)(b)(iii)(v) should be held unlawful and set aside as unsupported by substantial evidence. *Dickinson*

*v. Zurko*, 527 U.S. 150, 164 (1999) ("A reviewing court reviews an agency's reasoning to determine whether it is 'arbitrary' or 'capricious,' or, if bound up with a record-based factual conclusion, to determine whether it is supported by 'substantial evidence.'"). [7]

## III. THE RECORD CONTAINS NO EVIDENCE THAT MR. KAKAR'S USE OF WEAPON UPON BEHALF OF THE AFGHAN GOVERNMENT WAS CONTRARY TO AFGHAN LAW OR U.S.

(Kakar's Memo at 9-11; Gov't Memo at 15-17)

Inasmuch as the Taliban was – or at least controlled – the Afghan government in 1999[8], there was no difference between the Taliban and Afghanistan

---

[7] In his opening brief, Mr. Kakar relied upon the Supreme Court's decision in *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) to state the standard of review as "(a)gency action is arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Kakar Memo at 8. However, inasmuch the decision here is bound up with a record-based factual conclusion, it appears that *Dickinson* is more applicable, as well as more recent, than *State Farm*.
[8] "In 1999, the United States **Government** imposed sanctions on the Afghan **Government**, which was controlled by the **Taliban**," *Tel. Sys. Int'l v. Network Telecom PLC*, 303 F. Supp. 2d 377, 379 (S.D.N.Y. 2003). See also *Hedges v. Obama*, 724 F.3d 170, 190 n.125 (2d Cir. 2013) (the **Taliban** … was the **government** of **Afghanistan** when the AUMF was passed). The Authorization for Use of Military Force (AUMF) was enacted on September 18, 2001. Id. at 173. The government objects that case law not a legitimate source of judicial notice of, or way to establish, geopolitical facts, …". However, FRE 201(b) provides that "(t)he court may judicially notice a fact that is not subject to reasonable dispute because it:
∫ (**1**) is generally known within the trial court's territorial jurisdiction; or
∫ (**2**) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."
*Continued on the bottom of the following page*

Army. Accordingly, it was certainly not contrary to Afghan or U.S. law for him to use a firearm in his country's military, regardless of his intent. The government responded by claiming that "there is no circumstance under which it would be lawful 'under the laws of the United States' for one group of militants (or for the local or federal government) to militarily oppress religious persons, let alone to do so in favor of adherents of yet another religion." Gov't memo at 16. However, the government points to nothing in the record supporting its claim that Mr. Kakar "militarily oppressed religious persons". Nor is it even apparent what the government thinks to have "militarily oppressed" someone means or what law(s) it claims that this would have contravened. Certainly the mere fact that a government uses firearms against a religious based group that takes arms against it does not, in itself, establish that the government is militarily oppressing religious persons.

Finally, no matter how broadly Congress drafted the terrorist bars to relief they did not do so so broadly as to bar activities in Afghanistan which are not unlawful under the laws of Afghanistan or the U.S.. The government has failed to explain how service in one's Armed Forces is unlawful under either country's laws.

---

Mr. Kakar does not share the government's low opinion of the fact finding abilities of the federal courts Rather, he maintains that the unreversed opinions of U.S. federal judges are indeed, at least as to factual matters, sources whose accuracy cannot reasonably be questioned.

It goes without saying that in none of the cases cited by the government was the alien serving in his own country's armed forces.

Inasmuch as there is no evidence in the record that Mr. Kakar's use of a firearm in Afghanistan was contrary to Afghan or U.S. law, the USCIS's conclusion that he is inadmissible for having engaged in terrorist activities is unsupported by substantial evidence. *Dickinson,* 527 U.S. at 164.

## IV. CAA 2008 691(f)(2) DID NOT IMPLIEDLY REPEAL USA PATRIOT ACT 411(c)(3)(A) BECAUSE SUCH A CONSTRUCTION IS NOT ABSOLUTELY NECESSARY  IN ORDER THAT THE WORDS OF CAA 2008 691(f)(2) SHALL HAVE ANY MEANING AT ALL.

(Kakar Memo at 11-13; Gov't Memo at 8)

Section 411(c)(3)(A) of the Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, Pub. L. No. 107-56, 411(c), 155 Stat. 272 (2001) is plain and unequivocal. This section provides that:

(A)      In general--Notwithstanding paragraphs (1) and (2), no alien shall be considered inadmissible under section 212(a)(3) of the Immigration and Nationality Act (8 U.S.C.1182(a)(3)), or deportable under section 237(a)(4)(B) of such Act (8 U.S.C.1227(a)(4)(B)), by reason of the amendments made by subsection (a), on the ground that the alien engaged in a terrorist activity described in sub clause (IV)(bb), (V)(bb), or(VI)(cc) of section 212(a)(3)(B)(iv) of such Act (as so amended) with respect to a group at any time when the group was not a terrorist organization designated by the Secretary of State under section 219 of such Act (8 U.S.C. 1189) or otherwise designated under section212(a)(3)(B)(vi)(II) of such Act (as so amended).

It means, quite simply, that one may not be found inadmissible because of actions taken upon behalf of a Tier I terrorist organization before it was so designated. *Bojnoordi v. Holder*, 757 F.3d 1075, 1077 (9th Cir. 2014). Nevertheless, the government argues that section 691(f)(2) of the Comprehensive Appropriations Act of 2008 makes material support of the Taliban a ground of inadmissibility even when it occurs years before the Taliban was designated as a Tier 1 terrorist organization, a result which would repeal 411(c)(3)(A) of the USA Patriot Act, at least as it applies to the Taliban. Such an argument must be viewed with extreme skepticism due to the very strong presumption against implied repeal. The Supreme Court has held that it "cannot conclude that a later statute impliedly repeals an earlier one unless 'the intention of the legislature to repeal [is] clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (alterations in original) (quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981)).[9]

Accordingly, the Supreme Court has adopted an extremely difficult test of implied repeal, which is seldom satisfied:

> We will not infer a statutory repeal unless the later statute 'expressly contradict[s] the original act'" or unless such a construction "is absolutely necessary . . . in order that [the] words [of the   later statute] shall have any meaning at all.
>
> *Nat'l Ass'n of Home Builders*, 551 U.S. at 662  (emphasis supplied).

---

[9] The issues are the same for an implied amendment. *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 788 (1981).

Here the argument for implied repeal clearly fails. No portion of Section 691 expressly contradicts Section 411(c)(3)(A) of the USA Patriot Act – it doesn't even mention it at all. In fact, the only way it does contradict Section 411(c)(3)(A) is, if when given the reading claimed by the government, the two statutes produce differing results when applied to Mr. Kakar's situation. However, the Supreme Court has expressly held that a legislative intent to expressly repeal a particular statute "is not 'clear and manifest' simply because 'the two statutes produce differing results when applied to the same factual situation.' *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976). "[T]hat," the Court pronounced, "no more than states the problem." *Id.*

Therefore the government's argument can only prevail if it is shown that CAA 2008 Section 691(f)(2) is meaningless unless it repeals USA Patriot Act Section 411(c)(3)(A) as it applies to the Taliban. This it cannot do. Even disregarding all references to the designation of the Taliban as a Tier I terrorist organization, Section 691(f)(2) has an obvious and plain meaning – it eliminates any temporal limitations on the Secretary of State's authority to issue waivers under Section 691(a).

CAA 2008 691 provides that:

⌡    RELIEF FOR IRAQI, MONTAGNARDS, HMONG AND OTHER REFUGEES WHO DO NOT POSE A THREAT TO THE UNITED STATES

Sec. 691.(a) Amendment to Authority to Determine the Bar to Admission Inapplicable Section 212(d)(3)(B)(i) of the Immigration and Nationality Act ( 8 U.S.C. 1182(d)(3)(B)(i)) is amended to read as follows:

o    "The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) shall not apply to a group within the scope of that subsection, except that no such waiver may be extended to an alien who is within the scope of subsection (a)(3)(B)(i)(II), no such waiver may be extended to an alien who is a member or representative of, has voluntarily and knowingly engaged in or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has voluntarily and knowingly received military-type training from a terrorist organization that is described in subclause (I) or (II) of subsection (a)(3)(B)(vi), and no such waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians. Such a determination shall neither prejudice the ability of the United States Government to commence criminal or civil proceedings involving a beneficiary of such a determination or any other person, nor create any substantive or procedural right or benefit for a beneficiary of such a determination or any other person. Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review such a determination or revocation except in a proceeding for review of a final order of removal pursuant to section 1252 of this title, and review shall be limited to the extent provided in section 1252(a)(2)(D). The Secretary of State may not exercise the discretion provided in this clause with respect to an alien at any time during which the alien is the subject of pending removal proceedings under section 1229a of this title.".

)    (b)  Automatic Relief for the Hmong and Other Groups That Do Not Pose a Threat to the United States.-- For purposes of section 212(a)(3)(B) of the Immigration and Nationality Act ( 8 U.S.C. 1182(a)(3)(B)), the Karen National Union/Karen Liberation Army (KNU/KNLA), the Chin National Front/Chin National Army (CNF/CNA), the Chin National League for Democracy (CNLD), the Kayan New Land Party (KNLP), the Arakan Liberation Party (ALP), the Mustangs, the Alzados, the Karenni National Progressive Party, and appropriate groups affiliated with the Hmong and the Montagnards shall not be considered to be a terrorist organization on the basis of any act or event occurring before the date of enactment of this section. Nothing in this subsection may be construed to alter or limit the authority of the Secretary of State or the Secretary of Homeland Security to exercise his discretionary

authority pursuant to section 212(d)(3)(B)(i) of the Immigration and Nationality Act ( 8 U.S.C. 1182(d)(3)(B)(i)).

⌡   (c)  Technical Correction.-- Section 212(a)(3)(B)(ii) of the Immigration and Nationality Act ( 8 U.S.C. 1182(a)(3)(B)(ii)) is amended by striking "Subclause (VII)" and inserting "Subclause (IX)".

⌡   (d)  Designation of the Taliban as a Terrorist Organization .-- For purposes of section 212(a)(3)(B) of the Immigration and Nationality Act ( 8 U.S.C. 1182(a)(3)(B)), the Taliban shall be considered to be a terrorist organization described in subclause (I) of clause (vi) of that section.

⌡   (e)  Report on Duress Waivers .-- The Secretary of Homeland Security shall provide to the Committees on the Judiciary of the United States Senate and House of Representatives a report, not less than 180 days after the enactment of this Act and every year thereafter, which may include a classified annex, if appropriate, describing--

o         (1)  the number of individuals subject to removal from the United States for having provided material support to a terrorist group who allege that such support was provided under duress;

o         (2)  a breakdown of the types of terrorist organizations to which the individuals described in paragraph (1) have provided material support;

o         (3)  a description of the factors that the Department of Homeland Security considers when evaluating duress waivers; and

o         (4)  any other information that the Secretary believes that the Congress should consider while overseeing the Department's application of duress waivers.

⌡   (f)  Effective Date .-- The amendments made by this section shall take effect on the date of enactment of this section, and these amendments and sections 212(a)(3)(B) and 212(d)(3)(B) of the Immigration and Nationality Act ( 8 U.S.C. 1182(a)(3)(B) and 1182(d)(3)(B)), as amended by these sections, shall apply to--

o         (1)  removal proceedings instituted before, on, or after the date of enactment of this section; and

o         (2)  acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing before, on, or after such date.

Here the provisions of Section 691(f)(2) serve to make it clear that the

Secretary of State can issue a waiver under CAA 2008 691(a) for any "acts and

conditions constituting a ground for inadmissibility, excludability, deportation, or

removal occurring or existing before, on, or after such date". Accordingly, section

691(f)(2) of CAA 2008 makes perfect sense without any impingement on Section 411(c)(3)(A) at all. Therefore, since Section 691(f)(2) doesn't expressly contradict Section 411(c)(3)(A) of the  USA Patriot Act, and reading it not to implicitly repeal  Section 411(c)(3)(A) doesn't render it meaningless, no implied repeal can be recognized.  Accordingly,  USA Patriot Act Section 411(c)(3)(A) prevents Mr. Kakar from being held inadmissible for providing material support to the Taliban prior to it being designated as a Tier 1 Terrorist Organization and so the USCIS did not act in accordance with law when it found Mr. Kakar inadmissible on that ground.

> ## V. THE FINDING THAT MR. KAKAR IS INADMISSIBLE UNDER SECTION 1182(a)(3)(B)(iv)(VI)(cc) BECAUSE HE GAVE ANY SUPPORT AT ALL TO THE TALIBAN IS NOT IN ACCORDANCE WITH LAW BECAUSE IT READS THE REQUIREMENT THAT THE SUPPORT BE "MATERIAL" OUT OF THE STATUTE

(Kakar's Memo at 15-20; Gov't Memo 17-20)

The USCIS held that Mr. Kakar's brief stint of cooking cleaning and washing clothes for the Taliban constituted material support. However, neither the USCIS nor the government have explained in what way it was "material". While the USCIS decision, perhaps wisely, maintained a discrete silence on the issue, the government has come straight out insisting that all support of a terrorist organization, no matter how trivial or irrelevant to terrorism is material support because "it is a zero-sum game: if a terrorist group need not pay for housekeeping, it can spend more on howitzers." Gov't memo at 20.

The government's interpretation fails because it reads the word "material" out of the statute, contrary to the longstanding canon that statutes should be read to avoid making any provision "superfluous, void, or insignificant." *TRW Inc.* v. *Andrews*, 534 U.S. 19, 31(2001) (internal quotation marks omitted). If this was in fact the basis for the USCIS's decision then it certainly should be held unlawful and set aside as not in accordance with law. 5 U.S.C. 706(2). Alternatively, since the USCIS failed to define "material support", or how Mr. Kakar's cooking, cleaning and washing clothes met that definition, its explanation of its decision is not clear enough that its "path may reasonably be discerned." *Bowman Transp., Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974). Either way its action is arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

In any event, in the absence of any direct statutory or regulatory guidance as to the definition of the word "material", this Court should default to another canon, namely

"(W)hen a statute contains a list of specific items and a general item, we usually deem the general item to be of the same category or class as the more specifically enumerated items." *Ass'n to Protect Hammersley v. Taylor Res*., 299 F.3d 1007, 1016 (9th Cir. 2002) quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999).

Cleaning, cooking and washing clothes are not of the same category or class as a safe house, transportation, communications, funds, transfer of funds or other m

aterial financial benefit, false documentation or identification, weapons (including

chemical, biological, or radiological weapons), explosives, or training.

Whatever "material" support means, it doesn't mean "support" alone and it

does mean something in the same category as a

safe house, transportation, communications, funds, transfer of funds or other materi

al financial benefit, false documentation or identification, weapons (including che

mical, biological, or radiological weapons), explosives, or training. 8 U.S.C.

1182(a)(3)(B)(iv)(VI). Therefore it doesn't mean cooking cleaning and washing

clothes, and the USCIS's decision to the contrary is either arbitrary and capricious

because it fails to explain how Mr. Kakar's support was material, or it is not in

accordance with law.[10]

> VI.   IT IS INCONSISTENT WITH THE STATUTORY
> LANGUAGE OF THE INA AND ABSURD TO ASSUME
> THAT THE "TALIBAN" REFERRED TO IN CCA 2008
> 691(d) INCLUDED THE AFGHAN ARMY MR. KAKAR
> WAS DRAFTED INTO IN 1999 MERELY BECAUSE

---

[10] The cases cited by the government are unpersuasive or irrelevant  for the following reasons: *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298-99 (3d Cir. 2004): Did not define "material", did not distinguish between "material support" and support, and simply rejected the petitioner's argument that providing food and shelter was not material support because it was defined as such in a different statute without explaining why it in fact was material for purposes of the INA.  In *Annachemy v. Holder,* 733 F.3d 254 (9th Cir. 2013) and *S-K-* the aliens provided funds to the terrorist organization, which is among the items expressly defined as material support. Finally, Mr. Kakar has no idea why the government cited *Abdisalan v. Holder*, 774 F.3d 517, 527 (9th Cir. 2014) since the only substantive issue there was the agency's finding that petitioner's asylum claim was time-barred.

THE TALIBAN THEN CONTROLLED THE AFGHAN
GOVERNMENT

(Kakar's memo at 20-22; Gov't memo at 17)

In 2007 the "Taliban" was merely a group operating outside the Afghan government's authority which controlled some areas. 2007 Country Reports on Human Rights Practices, online at https://www.state.gov/j/drl/rls/hrrpt/2007/100611.htm (last accessed 7/9/2017). On the other hand, as noted above, in 1999 the Taliban was in control of the Afghanistan government. It is absurd to assume that by referring to a group operating outside the Afghan's government authority in 2007 the Congress intended to include the Afghan government throughout the period it was controlled by the Taliban (at least 1999-2001)[11]. If Congress had meant to take the extraordinary and completely unprecedented step of retroactively declaring an entire government a terrorist organization, so that even paying taxes fines or fees to it (as presumably would have been done by the vast majority of Afghan adults living in that country at that time, now our nominal allies in the War Against Terrorism), would render one permanently inadmissible to the United States, it surely would have said so.

Further, it is apparent that it was never intended that a state could be classified as a foreign terrorist organization under 8 USC 1189. For example, when Congress decided to take action against state sponsors of terrorism it used the term

---

[11] *See* note 8, *supra.*

24

"country" to refer to them.  22 USC 2371, 50 USC 4605(j), 22 U.S.C 2780. This is a term which does not appear in 8 U.S.C. 1189 nor in section 691 of the Consolidated Appropriations Act of 2008 designating the Taliban under 8 U.S.C. 1189. Nor has the Department of State ever designated Iran, Sudan or Syria or any other country as a foreign terrorist organization even though they are designated as state sponsors of terrorism under  section 6(j) of the Export Administration Act, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act. See "State Sponsors of Terrorism" online at https://www.state.gov/j/ct/list/c14151.htm (last accessed November 26, 2017).[12]

Accordingly, the mere fact that Mr. Kakar was drafted into the Afghan Army during a time it was under the Taliban's control is insufficient to subject him to inadmissibility as a supporter of a terrorist organization, inasmuch as Afghanistan is a "country", not an organization, and such an interpretation would in any event have the absurd result of rendering inadmissible virtually every adult citizen of Afghanistan in that country from 1999-2001 as providing material support to a foreign terrorist organization.

"We must assume that when drafting the INA, Congress did not intend an absurd or manifestly unjust result." *Lockhart v. Napolitano*, 573 F.3d 251, 260 (6th Cir. 2009), citing *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 509–10 (1989). It would be both absurd and manifestly unjust to permanently bar from the United

---

[12] Mr. Kakar asks the Court to take judicial notice of this official government website.

States virtually the entire adult population of Afghanistan from 1999-2001 as

material supporters of terrorism simply because they had the bad luck of living in a

country controlled by terrorists.

CONCLUSION

This Court should grant Mr. Kakar's motion for summary judgment, deny the

government's cross-motion, and remand this matter to the USCIS for

readjudication without deeming Mr. Kakar inadmissible under any provision of 8

USC 1182(a)(3)(B).

Respectfully submitted this 30th day of November, 2017.


*/s/Michael E. Piston*
Michael E. Piston
Attorney for Plaintiff
225 Broadway Ste 307
New York, NY10007
Ph: (646)845-9895
Fax: (206)770-6350
Email: michael@piston.net


To:
BRIDGET M. ROHDE
 Acting United States Attorney
Counsel for Defendant
 Eastern District of New York
 271 Cadman Plaza East, 7th Floor
 Brooklyn, New York 11201


LAYALIZA SOLOVEICHIK
 Assistant United States Attorney
 (718) 254-6298
 layaliza.soloveichik@usdoj.gov

CERTIFICATE OF SERVICE

This is to certify that on November 30, 2017 I emailed the foregoing to:

LAYALIZA SOLOVEICHIK
 Assistant United States Attorney
*Counsel for Defendant*
 Eastern District of New York
 271 Cadman Plaza East, 7th Floor
 Brooklyn, New York 11201
  (718) 254-6298
 layaliza.soloveichik@usdoj.gov


*s/Michael E. Piston*
Michael E. Piston
Attorney for the Plaintiff