UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
Mohamed Qaseem Kakar,

              *Plaintiff*,

     v.

United States Citizenship and
Immigration Services,

              *Defendant*.
---------------------------------X

<u>**MEMORANDUM & ORDER**</u>

16-cv-5032 (KAM)

      On September 9, 2016, plaintiff Mohamed Qaseem Kakar ("Mr. Kakar") commenced this action against the United States Citizenship and Immigration Services ("USCIS") seeking review, under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. ("APA"), of USCIS's April 5, 2016 decision denying his application for adjustment of status to become a lawful permanent resident and finding plaintiff inadmissible on two separate grounds: (1) for engaging in terrorist activity, as defined under 8 U.S.C. § 1182(a)(3)(B)(iii)(V) (the "Weapons Bar"), by using a weapon with intent to endanger, directly or indirectly, and (2) for engaging in terrorist activity, as defined under 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc) (the "Material Support Bar"),[1] by providing material support to the

---

[1] Title 8 U.S.C. 1182(a)(3)(B) codifies section 212(a)(3)(B) of the Immigration and Nationality Act ("INA"), and thus, references to either statute are to be construed interchangeably. (ECF No. 16, Administrative Record "AR", at 3.)

Taliban, a Tier I terrorist organization.  (ECF No. 1,
Complaint, at ¶¶ 1, 4, 13.)

Before the court are the parties' cross-motions for
summary judgment.  Mr. Kakar moves for summary judgment on the
grounds that (i) USCIS's April 2016 decision was unlawful,
arbitrary and capricious, and should be set aside under 5 U.S.C.
§ 706(2); (ii) the finding that Mr. Kakar is inadmissible on
account of engaging in terrorist activities is barred by res
judicata and/or collateral estoppel; (iii) the finding that Mr.
Kakar is inadmissible for providing material support to a Tier I
terrorist organization is barred by the US PATRIOT Act.  (*See*
ECF No. 30-2, Plaintiff's Memorandum in Support of Motion for
Summary Judgment ("Pl. Mem.") 1-4.)  USCIS cross-moves for
summary judgment on the grounds that its denial of plaintiff's
adjustment of status, seeking lawful permanent residence, based
on two separate, terrorism-related inadmissibility grounds, was
lawful and not arbitrary, capricious, or an abuse of discretion.
(ECF No. 27, Defendant's Cross-Motion for Summary Judgment
("Def. Mem."), at 1-2.)   For the reasons set forth below, the
court hereby GRANTS USCIS's cross-motion for summary judgment
and DENIES Mr. Kakar's motion for summary judgment.

## Background

The following facts are taken from the administrative
record and the documents included or integral to it, and the

parties' submissions-including sworn affidavits and exhibits-
filed in connection with the present motion.  Unless otherwise
noted, the facts are undisputed.

## I.   Plaintiff's Application for Asylum

Mohammed Qaseem Kakar was born in Kandahar,
Afghanistan in 1977.  (ECF No. 30-1, Plaintiff's Rule 56.1
Statement of Undisputed Facts ("Pl. 56.1 Statement), at ¶ 1).
Mr. Kakar does not have any formal education, but instead
attended approximately four years of religious training during
his childhood.  (*Id.* at ¶ 2.)  Mr. Kakar and his family are
Shi'a Muslims.  (*Id.* at ¶ 6.)

On November 25, 1999, Mr. Kakar entered the United
States at John F. Kennedy International Airport. (ECF No. 16, AR
187.)[2]  Mr. Kakar was found to be an Afghan national lacking a
valid visa and was therefore inadmissible under § 212(a)(7) of
the INA.  (*Id.* at 187-88.)

Plaintiff sought asylum shortly after entry into the
United States.  In a sworn statement made on November 26, 1999,
the day after his entry, Mr. Kakar explained that he was an
Afghan citizen and had entered the United States illegally,
using a passport provided by a smuggler.  (*Id.* at 170.)  Mr.
Kakar claimed that he feared persecution by the Taliban militia,

---

[2] Citations to the administrative record and all other documents filed using
the Electronic Court Filing System ("ECF") utilize the page numbers generated
by ECF for purposes of consistency.

made up of predominately Sunni Muslims, due to his religious beliefs. (*Id.* at 168.)   Mr. Kakar is an adherent of the Shi'a branch of Islam.  (*Id.* at 170.)   On multiple occasions, the Taliban seized either Mr. Kakar or his brothers, and Mr. Kakar alleged that at one point he was forced into labor for the Taliban. (*Id.* at 171.)  Mr. Kakar explained that for a one-week period, the Taliban forced him to "do[] everything, cook[], wash[ ]clothes, and clean[]." (*Id.*)  Mr. Kakar alleged that the Taliban "gave [him] a gun and [he] shot it." (*Id.*)  Mr. Kakar eventually escaped from the Taliban when his captors took him to mosque for prayer. (*Id.*)

At Mr. Kakar's Credible Fear Interview on November 30, 1999, Mr. Kakar asserted that he fled Afghanistan because he feared for his life due to persecution by the Taliban. (*Id.* at 163-165.)  Mr. Kakar explained that he was persecuted by the Taliban for listening to music and failing to wear a long beard, and he was arrested for two weeks, beaten and whipped by the Taliban forces after they caught him listening to music. (*Id.* at 165.)  Notably, rather than the "one week" of impressment noted in plaintiff's earlier submission, Mr. Kakar's Credible Fear Interview testimony stated that Mr. Kakar was drafted and served in the Taliban military for 25 days. (*Id.* at 162-163.)  Mr. Kakar worked during that time as "a cook" and "fighting the opposition, the Masood Group" who were "Shiite." (*Id.* at 164.)

4

When asked if he "took part in the actual fighting . . . as a soldier," he responded, "Yes, I was taken by force to fight with them and I used a gun." (*Id.*)  He later specified that the gun was a "Kalashnikov" and he used it against men only.  (*Id.* ("Q: What type of people did you use this gun against? Men or women, adults or children? A [Mr. Kakar]: They were all men.").)  The asylum officer found that Mr. Kakar's statements were "sufficiently specific and detailed," and that his "alleged experiences are consistent with known country conditions in Afghanistan." (*Id.* at 168.)  Therefore, on December 6, 1999, the asylum officer found that Mr. Kakar had made statements that "establish[ed] credibility under the credible fear standard" and that there was a "significant possibility" that Mr. Kakar could establish eligibility for asylum.  (*Id.* at 168, 181-84.)

On December 7, 1999, Mr. Kakar was served with a Notice to Appear for Removal Proceedings.  (ECF No. 16, AR, at 176-77.)  The notice cited only one ground of inadmissibility; that Mr. Kakar, a citizen of Afghanistan, had arrived at a port of entry without a valid entry document.  (*Id.* at 176.)  As such he was inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(1).  (*Id.*)  The Notice to Appear did not cite any terrorism-related grounds under 8 U.S.C. § 1182(a)(3)(B)(i)(I)."  (ECF No. 27, Def. Mem. at 10.)  The Immigration Court scheduled plaintiff for a "Hearing in Removal Proceedings" to take place on March 28,

2000.  (*Id*. at 144.)  At the hearing on March 28, 2000, an
Immigration Judge sitting in Jamaica, New York granted plaintiff
asylum.  (*Id*. at 87-89.)  No rationale was provided for the
Order, which was issued via a form printout on which a box was
checked indicating the award of asylum.  (*Id*. at 87.)  The Order
noted that Mr. Kakar's application for withholding of removal
was not reached.  (*Id*.)

## II.  Plaintiff's Application for Adjustment of Status

On January 12, 2006, Mr. Kakar applied for Adjustment
of Status on Form I-485 (the "Adjustment Application"). (*Id*. at
73-77.)  By letter dated May 1, 2008, USCIS sent Mr. Kakar a
Request for Evidence, regarding an improperly completed medical
form.  (*Id*. at 62.)  Plaintiff submitted the completed form and
supporting documentation.  (*Id*. at 62-71).  By letter dated
December 10, 2012, Mr. Kakar's attorney mailed a formal inquiry
regarding the status of the Adjustment Application.  (*Id*. at
44).  Plaintiff's attorney stated, "After numerous inquiries
regarding the status of Mr. Kakar's case, I was recently advised
that it is on hold because 'he appears to be inadmissible under
§ 212(a)(3)(B) of the INA.'"  (*Id*.)

Mr. Kakar's attorney argued that the terrorism-related
bars to admissibility did not apply because Mr. Kakar's
"service" to the Taliban was involuntary and any material
support provided to the Taliban was provided under duress.  (*Id*.

at 44-48.)  Plaintiff submitted a sworn statement dated April
23, 2012 in support of the letter prepared by his counsel in
which he stated, "[T]he Taliban took me to a camp where they
made me cook, wash clothes, and do cleaning," and explained,
"[O]ne day, they forced me to take a gun and help them fight."
(*Id.* at 43.)  He emphasized that, "If [he] had not done what
they told [him] to, they would have killed [him]," and said, "I
do not like or agree with the Taliban, and I did not want to
help them, so I ran away when I got the chance, and left the
country."  (*Id.*)

On September 30, 2013, USCIS issued a Notice of Intent
to Deny ("NOID") Mr. Kakar's Form I-485, Application for
Adjustment of Status.  (*Id.* at 24-26.)  The NOID explained that
during Mr. Kakar's Credible Fear Interview in November 1999, he
stated that the Taliban abducted him for twenty-five days,
during which he fought for the Taliban against the Masood group
using a Kalashnikov against Masood's armed men.  (*Id.* at 25.)
Mr. Kakar also testified that he used a gun while in forced
service to the Taliban in a January 21, 2000 statement.  (*Id.*)
The NOID specifically referenced Mr. Kakar's January 21, 2000
statement, saying, "[T]he Taliban sent you to a training camp
for one week and . . . later you were 'forced to cook, wash
clothes, and do cleaning for the Taliban.'"  The NOID
explained:

7

> The Taliban was designated by Congress as a terrorist
> organization, retroactively, under INA section
> 212(a)(3)(B)(vi)(I), in the Consolidated Appropriations Act
> of December 26, 2007. Thus, you are inadmissible under INA
> section 2l2(a)(3)(B)(i)(VIII) and 2l2(a)(3)(B)(i)(I) for
> having engaged in terrorist activities as defined by
> 212(a)(3)(B)(iv)(I) and 2l2(a)(3)(B)(iv)(VI)(cc), when you
> acted as a combatant for the Taliban against the Masood Group,
> received military training from the Taliban, and cooked,
> washed cloths, and cleaned for the Taliban. While there are
> exemptions available for material support under duress to,
> and receipt of military training under duress from, a
> terrorist group, there is no exemption for acting as a
> combatant, even under duress. Accordingly, USCIS intends to
> deny your application to adjust status.

USCIS gave Mr. Kakar thirty-three days to explain why his
conduct did not render him inadmissible for engaging in
terrorist acts as defined by the INA. (*Id.* at 26.)

On October 29, 2013, Mr. Kakar responded, through his
prior counsel, Ms. Cheryl Baratta, arguing that "1) USCIS is
collaterally estopped from finding [Mr.] Kakar inadmissible
under INA § 212(a)(3)(B), because [Mr.] Kakar has already been
implicitly found not to be inadmissible under that statute; and
in any event, 2) [Mr.] Kakar did not engage in 'terrorist
activity' as defined in § 212(a)(3)(B) of the INA." (*Id.* at 27-
30.) Mr. Kakar submitted a supporting affidavit stating that
"[e]ven though the place where the Taliban took me was a
training camp, I never took part in any Taliban military
training," and stating that he took the gun the Taliban gave him
when the Taliban ordered him to fight because had he "refused to
take the gun, the Taliban would have killed [him]." (*Id.* at 31-

32.)  For the first time, Mr. Kakar explained, "I never shot anyone; I just fired the gun at nobody," and further stated, "When I took the gun, I never intended to hurt or kill anyone or to help the Taliban's cause."  (*Id.*)  Mr. Kakar also clarified that he was forced to clean, cook and wash for 25 days.  (*Id.* at 31.)

On April 5, 2016, USCIS denied Mr. Kakar's Application to Adjust Status based on his activities, to wit, using a gun under Taliban direction "against other individuals with the intent to endanger, directly or indirectly, the safety of one or more individuals," and cleaning, cooking, and washing for the Taliban, citing Mr. Kakar's own admissions in his Credible Fear Interview and in his affidavit accompanying his I-589 Application for Asylum and for Withholding of Removal.  (*Id.* at 2-5, 9.)  USCIS found Mr. Kakar inadmissible because he engaged in two statutorily recognized forms of terrorist activity:

> [B]ased on the activity described above, you are inadmissible under INA section 212(a)(3)(B)(i)(I) for committing, "under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity," where, as described by 212(a)(3)(B)(iii), you used a weapon against other individuals with the intent to endanger, directly or indirectly, the safety of one or more individuals. You are also inadmissible under INA section 212(a)(3)(B)(i)(I) for having engaged in terrorist activities, as defined by 212(a)(3)(B)(iv)(VI)(cc), when you provided material support to the Taliban by cleaning, cooking and washing clothes. While there are exemptions available for material support and certain other activities performed under duress, there is no existing exercise of the Secretary's discretionary exemption

authority under INA section 212(d)(3)(B)(i) that applies to the use of a weapon under duress.

USCIS stated, "prior consistent statements, given in 1999 and 2000, indicate that [Mr. Kakar] used the gun against other combatants" and conflicted with Mr. Kakar's 2013 statement that he "fired the gun at nobody," raised for the first time in response to a notice of intent to deny his application for adjustment of status.  USCIS found that the inconsistent 2013 statement was not credible and did not overcome a finding of inadmissibility under the Weapons Bar.  (*Id.* at 5.)  Further, "[w]hile there are exemptions available for . . . certain . . . activities performed under duress, there is no existing exercise of the Secretary's discretionary exemption authority under INA section 212(d)(3)(B)(i) that applies to the use of a weapon under duress."  (*Id.* at 9.)  Regarding the second ground for denial, the Material Support Bar, USCIS noted that Mr. Kakar conceded his activity forming the basis of the material support finding – the cleaning, cooking, and washing clothes for the Taliban.  (*Id.*)

## III. Procedural Posture

On September 9, 2016, Mr. Kakar commenced this action seeking APA review of USCIS's denial of his Application to

Adjust Status.[3]  (*See* ECF No. 1, Complaint, at 1.)  On March 28,
2017, USCIS answered the Complaint.  (*See* ECF No. 10, Answer.)
On July 12, 2017, Mr. Kakar moved for summary judgment.  (*See*
ECF No. 30.)  On September 13, 2017, USCIS cross-moved for
summary judgment.  (*See* ECF No. 27, Def. Mem.)  On July 27,
2018, the parties were heard at oral argument on their motions.
(ECF No. 37, Oral Argument Transcript ("Tr."), at 62.)  The
court set a briefing schedule for the parties to submit their
supplemental briefs.  On December 26, 2018, the parties
submitted their supplemental briefs in support of their
respective motions for summary judgment.

## Standard of Review

### I.    Summary Judgment

        Pursuant to Federal Rule of Civil Procedure 56, "[a]
motion for summary judgment may properly be granted — and the
grant of summary judgment may properly be affirmed — only where
there is no genuine issue of material fact to be tried, and the
facts as to which there is no such issue warrant the entry of
judgment for the moving party as a matter of law."  *Rogoz v.
City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting
*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010))
*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

---

[3] USCIS's April 2016 denial of Mr. Kakar's adjustment of status was final and
not appealable.  (*See* AR at 9.)

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Typically, in deciding a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). To defeat a motion for summary judgment, the non-moving party must identify probative, admissible evidence from which a reasonable factfinder could find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-257 (1986). If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted). In this APA case, the court relies on the administrative record for the material facts. *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("[A] district court's review under the arbitrary and capricious standard is limited to the administrative record."); *Brezler v. Mills*, 220 F. Supp. 2d 303, 307 (E.D.N.Y. 2016) ("[B]ecause this is an APA review, the Court has relied upon only the administrative record in reaching its holding.").

## II.   Scope of Review Under the APA

In reviewing cases under the APA, the court "begin[s] by reviewing the agency's construction of the statute at issue . . . by applying the familiar two-step process of statutory interpretation established by *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984)." *Miezgiel v. Holder*, 33 F. Supp. 3d 184, 188 (E.D.N.Y. 2014) (citation omitted).  The court must first consider "'whether Congress has directly spoken to the precise question at issue'; if so, [the] inquiry is at an end." *Id.* (citing *Bellevue Hosp. Ctr. v. Leavitt,* 443 F.3d 163, 174 (2d Cir. 2006)).  If the statute is ambiguous, however, the court must determine whether the agency's construction of the statute is reasonable.

If the agency action was authorized by statute, the court must consider whether the agency's decision "was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (citing 5 U.S.C. § 706(2)); *see also United States v. Int'l Bhd. of Teamsters*, 170 F.3d 136, 143 (2d Cir. 1999).  In making that determination, the court's review is limited to the administrative record.  5 U.S.C. § 706; *Int'l Bhd. of Teamsters*, 170 F.3d at 143.  "The scope of review under the 'arbitrary and capricious' standard is narrow, and courts should not substitute their judgment for that of the agency." *Karpova v. Snow*, 497

F.3d 262, 267 (2d Cir. 2007) (citation omitted); *see also Gully v. Nat'l Credit Union Admin.,* 341 F.3d 155,163 (2d Cir. 2003) (quoting *Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd.,* 247 F.3d 437, 441 (2d Cir. 2003)) ("Our review under these standards is narrow and 'particularly deferential.'").  This is a very deferential standard:

> An agency determination will only be overturned when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Karpova v. Snow,* 497 F.3d. at 267-268.  The court will uphold an agency's decision "so long as the agency examines the relevant data and has set out a satisfactory explanation, including a rational connection between the facts found and the choice made."  *Id.* at 268 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *see also Gully*, 341 F.3d at 163.

## Discussion

Mr. Kakar makes three main arguments in his Motion for Summary Judgment.  First, that USCIS's decision with regards to the statutory bars to admissibility was arbitrary and capricious and unsupported by substantial evidence.  Second, that USCIS is collaterally estopped from denying plaintiff's application to adjust status based on plaintiff "engaging in terrorist

activities."[4]   Third, that cooking, cleaning, and washing clothes
do not constitute material support under the INA section
212(a)(3)(B)(iv)(IV) because "material" is not an ambiguous
term, and even if it were, the BIA's interpretation of the term
in *Matter of A-C-M*, 27 I&N Dec. 303 (BIA 2018) was not
reasonable because it would render the term "material"
superfluous or violate the statutory canon of *ejusdem generis*.[5]

    USCIS cross-moves for summary judgment on the grounds
that its denial of plaintiff's adjustment of status, seeking
lawful permanent residence, based on two separate, terrorism-
related inadmissibility grounds, was lawful and not arbitrary,
capricious, or an abuse of discretion.  (ECF No. 27, Def. Mem.
1-2.)

---

[4] In his opening brief, Mr. Kakar alleges in detail facts and cases in support
of his argument regarding preclusion of a decision on admissibility under the
theory of res judicata, and not collateral estoppel.  (*See* ECF No. 30, Def.
Mem., 20-25.)  Res judicata and collateral estoppel are distinct theories
with distinct bodies of law.  Plaintiff's counsel abruptly switches gears in
his reply and states, "Mr. Kakar inadvertently mislabeled the doctrine he was
referring to in his opening memo as 'res judicata.'  That is incorrect and he
regrets the error."  (ECF No. 31, Pl. Opp., at 2, n.2.)  As Mr. Kakar clearly
indicates that he does not intend to put forth an argument related to res
judicata, and he abandoned his res judicata argument at oral argument and in
his supplemental briefing, the court will address only the issue of
collateral estoppel.
[5] Plaintiff's counsel argued in his opening brief that the PATRIOT Act
provides that Mr. Kakar cannot be held inadmissible for material support
provided to the Taliban prior to it being designated as a terrorist
organization.  (ECF No. 30-2, at 11-13.)  This argument was also addressed by
both parties at oral argument.  Because the court grants summary judgment in
favor of USCIS on the Weapons Bar ground, an independent and sufficient basis
for inadmissibility, the court need not and expressly does not resolve
whether or not the CAA's designation of the Taliban as a Tier I terrorist
organization applies retroactively in this case with respect to the Material
Support Bar.

For the reasons that follow, summary judgment in favor of USCIS is appropriate as USCIS's April 2016 denial of plaintiff's adjustment application based on the Weapons Bar was not arbitrary and capricious, was supported by substantial evidence, and showed a "rational connection between the facts found and the choice made." *Karpova*, 497 F.3d at 268.  For an alien to be eligible to adjust status to that of a permanent resident, he must be admissible "at the time of examination for adjustment of such alien."  (ECF No. 16, AR at 2 (quoting INA § 209(b)); *see* 8 U.S.C. § 1159(b)(5).)  Based on the facts in the record, USCIS reasonably found that Mr. Kakar was inadmissible based on the Weapons Bar, a sufficient independent basis for inadmissibility.

## I.   USCIS Properly Found Plaintiff Inadmissible for Using a Firearm in Support of a Terrorist Organization

USCIS's finding that Mr. Kakar's use of a Kalashnikov rifle while conscripted in service of the Taliban was in violation of 8 U.S.C. § 1182 was not arbitrary and capricious, but rather was based on a well-reasoned analysis of the facts in the record and application of those facts to 8 U.S.C. § 1182, a statute addressing the admissibility qualifications of aliens.

Title 8 U.S.C. § 1182 unambiguously establishes that an alien is inadmissible if he uses "any . . . firearm, or other weapon . . . . with intent to endanger, directly or indirectly,

the safety of one or more individuals." 8 U.S.C. §

1182(a)(3)(B)(iii)(V). In denying Mr. Kakar's Application to

Adjust Status, USCIS explained that it based its decision

regarding the Weapons Bar on statements Mr. Kakar had made, on

numerous occasions, that he had used a firearm against

individuals. First, during his Credible Fear Interview dated

November 30, 1999, Mr. Kakar described a 25-day period when he

was "drafted" by the Taliban to work as "a cook and also

fighting the opposition, the Masood Group," who were "Shiite."

(ECF No. 16, AR. at 164.) When asked if he "took part in the

actual fighting . . . as a soldier?" Mr. Kakar responded, "Yes.

I was taken by force to fight with them and I used a gun."

(*Id.*) Mr. Kakar later specified that the gun was a

"Kalashnikov" and he used it against men only. He also

specified that the Masood men against whom he fought were also

armed. (*Id.*) Mr. Kakar submitted an affidavit dated April 3,

2012 describing the circumstances under which he used the gun,

stating,

> The Taliban are Sunnis and they began persecuting or killing
> Shias. In 1999, my own family was forced out of our house by
> the Taliban, then made to pay a penalty to return. Also in
> 1999, the Taliban took me away three different times . . .
> The last time . . . the Taliban took me to a camp where they
> made me cook, wash clothes, and do cleaning. One day, they
> forced me to take a gun and help them fight. If I had not
> done what they told me to, they would have killed me. I do
> not like or agree with the Taliban, and I did not want to
> help them, so I ran away when I got the chance, and left the
> country. The Taliban forced me to help them back in 1999, or

> I never would have done so.  Since then, I have never helped
> the Taliban or any other group in any way.

(ECF No. 16, AR, at 43.)

USCIS further explained that Mr. Kakar only denied use
of the Kalashnikov against persons in response to a 2013 NOID
that stated that his described use of the Kalashnikov
constituted terrorist activity.  (*See id.* at 4-5.)  Mr. Kakar
submitted a response to the NOID wherein, for the first time, he
asserted that he did not "intend[] to endanger" while using the
gun and that he had "fired the gun at nobody." (*See id.*)  USCIS
determined the more recent statement conflicted with Mr. Kakar's
two past statements that he engaged in "actual fighting" and
"used a gun against men," and was "not credible."  USCIS noted
the timing of Mr. Kakar's newly minted denial, which appeared to
be a thinly-veiled attempt to bypass the Weapons Bar, and the
blatant inconsistency between his earlier statements that he
took part in actual fighting with the Taliban as a soldier and
his subsequent statement that he only fired a gun into the air.
(*See* AR at 4-5, 159, 164.)

Plaintiff argues that USCIS's decision is arbitrary
and capricious, "as running counter to the evidence in the
record in that the record contains no evidence that Mr. Kakar
used a firearm with an intention of endangering the safety of
any individual nor causing damage to property . . . and . . .

18

because the record contains no evidence that any acts of war committed by Mr. Kakar while serving in the Afghan military were contrary to Afghan or U.S. law." (See ECF No. 30-2, Pl. Mem. 7.) Mr. Kakar further argues that the government needs to show not only that a firearm was used in support of a terrorist organization, but that it was used, "with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." (See id. at 10-11.) Further, Mr. Kakar argues that when the statute is interpreted in this way, his statements regarding using a firearm but firing it at nobody are not inconsistent.

In *Bailey v. United States*, the court found that the definition of "use" of a firearm included "brandishing, displaying, bartering, striking with, and firing or attempting to fire a firearm, as well as the making of a reference to a firearm in a defendant's possession." *Bailey v. United States*, 516 U.S. 137, 138 (1995). Although plaintiff cites *Bailey* to argue that certain of the uses, such as brandishing and displaying, negate the requisite intent for violating the Weapons Bar, he disregards the *Bailey* court's finding that brandishing, displaying, bartering, striking with, and firing or attempting to fire a firearm can all constitute "actively employ[ing] a firearm during and in relation to [a] . . . crime." *Id.*; *see also* ECF No. 30-2, Pl. Mem., at 6-8.

19

Mr. Kakar's claim that he "fired his weapon in the air" is not contained anywhere in the administrative record or any statement submitted by plaintiff under penalty of perjury, and thus cannot be considered as evidence.  (*See generally* AR.) Further, Mr. Kakar fails to cite any controlling case law in support of his contention that intent must be substantively proven by USCIS, or that otherwise supports his interpretation of the relevant facts in the record over USCIS's.

USCIS's evaluation of Mr. Kakar's statements regarding his use of a firearm under the Taliban's direction prior to the NOID is objectively reasonable.  USCIS's denial of adjustment of status was supported by the record, and explained its adverse credibility assessment of plaintiff's post-NOID statement regarding firing the gun at nobody.  Thus, USCIS's decision regarding the Weapons Bar is not arbitrary or capricious and was supported by substantial evidence.  *See Karpova v. Snow,* 497 F.3d. at 267-268.

Mr. Kakar also argues that USCIS's application of the Weapons Bar was arbitrary and capricious because his military service with the Taliban was lawful and he used his weapon "in the service of his country" which does not meet the Weapons Bar's requirement that the conduct be "unlawful under the laws of the place where is committed."  *See* 8 U.S.C. § 1182(a)(3)(B)(iii); ECF No. 30, Pl. Mem., at 13-15).

First, plaintiff's argument is inconsistent with his assertions throughout the administrative record that he was forcibly conscripted into the Taliban militia.  Notably, Mr. Kakar contends that he was forced into service to the Taliban on pain of death and required to shoot at the Taliban's religious adversaries.  (*See* ECF No. 16, AR, at 153-155, 158-159, 171, 186; ECF No. 27, Def. Mem., at 16.)  In his asylum application, Mr. Kakar stated that the Taliban persecuted and killed Shi'a Muslims and members of the Tajik ethnic group.  He avers that he is three-quarters Tajik, and that "if the Taliban f[ou]nd out about this, my life could be in danger for that reason also." (*Id.* at 153-154.)  Mr. Kakar also attested to personal instances of religious persecution by the Taliban based on his religion as a Shi'a Muslim as predicates to his successful application for asylum.  (*Id.* at 152-54, 159, 171, 186.)  An article submitted in support of Mr. Kakar's asylum claim characterizes the Taliban as a "stringently fundamentalist faction."  (*Id.* at 130.)  The 1996 article, "From Chaos of the Cold War, Afghans Inherit a Brutal New Age," describes the Taliban saying, "The fighters of Taliban — the word is Arabic for students of Muslim religious Schools — include former guerrillas fighting the former Soviet-backed Government, veterans of the Afghan Communist forces and military novices recruited from school in Afghanistan and Pakistan."  (*Id.* at 131.)  Persecution of ethnic and religious

groups, as alleged in the record and supported by the evidence
submitted with Mr. Kakar's asylum application, is not lawful
behavior.  Based on evidence submitted by Mr. Kakar, it is
highly implausible and logically inconsistent for Mr. Kakar to
now argue he was simply acting under the direction of a
legitimate Afghani government militia and, therefore, could not
have been engaging in prohibited terrorism-related conduct.

        Second, the Weapons Bar provision requires that the
relevant "terrorist activity" be "unlawful under the laws of the
place where it was committed (*or which*, if it had been committed
in the United States, would be unlawful under the laws of the
United States or any State)[.]"  INA § 212(a)(3)(B)(iii)
(emphasis added).  The court agrees with defendant's proffered
statutory interpretation that Mr. Kakar's weapon use would have
to be lawful under the laws of the foreign country where the
weapon use occurred and under the laws of the United States in
order to be admissible.  (ECF No. 44, Def. Supp. Mem. at 22-23.)
Because Mr. Kakar has failed to establish both prongs, his
argument fails.  Here, the record reflects plaintiff's repeated
statements that he had used a Kalashnikov against Shi'a Muslims
in the service of the Taliban.  (*See* AR 3-4, 158, 163.)  As
defendant notes, the use of a military-grade weapon to oppress a
religious group, or to advance one religion in order to suppress
another, would be manifestly unlawful under the laws of the

United States.  (*See* ECF No. 44, Def. Supp. Mem. at 21.)  Thus,
under the Weapons Bar, Mr. Kakar was properly deemed
inadmissible.

Even if violent suppression of a religious group were
lawful under the laws of the United States, which it is not, Mr.
Kakar has failed to establish that the Taliban was the
legitimate government of Afghanistan during the relevant period,
which he argued would render legal the service he made to the
Taliban for the relevant period.  Mr. Kakar cites to *Tel. Sys.
Int'l v. Network Telecom PLC*, 303 F. Supp. 2d 377, 379 (S.D.N.Y.
2003), and *Hedges v. Obama*, 724 F.3d 170, 190, n.125 (2d Cir.
2013), to support the proposition that the Taliban was the
legitimate government of Afghanistan at the time of Mr. Kakar's
forced service, and as such Mr. Kakar was legally serving in his
country's military.  (*See* ECF No. 31, Pl. Opp., at 14, n. 8.)
Mr. Kakar asks the court to take judicial notice of what he
claims is the finding, in *dicta* in both cases, that the Taliban
was the legitimate government of Afghanistan.  (*See id.*)
However, the court may not take judicial notice as proposed by
Mr. Kakar, under Federal Rule of Evidence 201.  *See Kramer v.
Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); Fed. R.
Evid. 201 ("(b) Kinds of Facts That May Be Judicially Noticed.
The court may judicially notice a fact that is not subject to
reasonable dispute because it: (1) is generally known within the

trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.")

Further, neither case cited by Mr. Kakar included an explicit judicial finding that the Taliban was in fact the government of Afghanistan during the relevant period. *See Hedges*, 724 F.3d at 190 n. 125 (finding "use of force against the Taliban may draw support also from the AUMF's reference to 'nations' insofar as it was the government of Afghanistan"); *Tel. Sys. Int'l*, 303 F. Supp. 2d at 379 (stating in dicta that the Afghan government was controlled by the Taliban). Nor has plaintiff established that the Taliban operated in a manner consistent with Afghan law during the relevant period, 1999. (*See* ECF No. 44, Def. Supp. Mem. 26-27.)

Further, Congress has explicitly spoken on whether the Taliban is a terrorist organization. The Consolidated Appropriations Act ("CAA") of 2008, INA section 212(a)(3)(B)(vi)(I), retroactively designated the Taliban a Tier I Terrorist Organization. *See* CAA, 2008, PL 110-161, December 26, 2007, 121 Stat. 1844. Section 691(d) of the CAA states:

> For purposes of section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. ¶1182(a)(3)(B)), the Taliban shall be considered to be a terrorist organization described in subclause (I) of clause (vi) of that section.

(See ECF No. 16, AR at 3). The Tier I terrorist organization designation of the Taliban was made retroactive by § 691(f) of the CAA of 2008:

> (f) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of enactment of this section, and these amendments and sections 212(a)(3)(B) and 212(d)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B) and 1182(d)(3)(B)), as amended by these sections, shall apply to—
>
> > (1) removal proceedings instituted before, on, or after the date of enactment of this section; and
> >
> > (2) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing *before*, *on*, *or after* such date.

*See* CAA, 2008, PL 110-161, December 26, 2007, 121 Stat. 2366 (emphasis added).

Mr. Kakar does not dispute that § 691(d) of the CAA of 2008 designated the Taliban as a Tier I terrorist organization generally for purposes of 8 U.S.C. § 1182(a)(3)(B). As Mr. Kakar's counsel acknowledged at oral argument, "the issue of retroactivity only applies to the issue of material support." (Tr. 37:22-25.) As such, Mr. Kakar's use of a weapon with intent to endanger others makes him inadmissible, because his conduct qualifies as a "terrorist activity," irrespective of whether the Taliban may retroactively be deemed a Tier I terrorist organization by the CAA. INA § 212(a)(3)(B)(iii)(V).

USCIS's well-reasoned analysis of Mr. Kakar's own testimony regarding the nature of the Taliban and its reasonable

interpretation of the CAA of 2008 must, therefore, stand.  The
APA review standard is extremely deferential, and the Second
Circuit requires that agency decisions be upheld where the
agency has identified "a rational connection between the facts
found and the choice made." *Karpova*, 497 F.3d at 268.  USCIS's
decision offers a factually-supported and well-reasoned basis
for its determination that Mr. Kakar is inadmissible due to the
Weapons Bar.  In the court's view, USCIS "examine[d] the
relevant data and has set out a satisfactory explanation
including a rational connection between the facts found and the
choice made." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007)
(citation omitted).  The Weapons Bar is an independent and
adequate grounds for finding inadmissibility, and as such is a
valid basis for USCIS's decision to deny Mr. Kakar's application
to adjust status.  USCIS's determination that Mr. Kakar was
inadmissible under the Weapons Bar will not be disturbed.  *Id*.

## II.  USCIS is Not Collaterally Estopped from Denying Plaintiff's Application to Adjust Status Based on the Weapons Bar

In order for an asylee to adjust their immigration
status, the asylee must be admissible "at the time of
examination for adjustment of such alien."  (ECF No. 16, AR, at
1 (quoting Immigration and Naturalization Act (the "INA") §
209(b)); 8 U.S.C. § 1159(b)(5).)  Further, USCIS cannot waive
terrorism-related inadmissibility grounds when adjudicating an

application to adjust status.  *See* 8 U.S.C. § 1159(c).  Mr.
Kakar's opposition brief raises, for the first time, an argument
that collateral estoppel precludes USCIS from considering
plaintiff's admissibility at the time plaintiff sought to adjust
his status because he previously had been granted asylum.  (See
ECF No. 31, Pl. Opp. 1-5, 8-12.)  However, USCIS disputes that
collateral estoppel applies, as the issue of admissibility was
not actually litigated and actually decided at the time Mr.
Kakar was granted asylum. (ECF No. 28, Def. Opp. 17.)

     The Second Circuit has instructed that collateral
estoppel applies when: "(1) the issues in both proceedings are
identical, (2) the issue in the prior proceeding was actually
litigated and actually decided, (3) there was a full and fair
opportunity for litigation in the prior proceeding, and (4) the
issues previously litigated were necessary to support a valid
and final judgment on the merits."  *Ali v. Mukasey*, 529 F.3d
478, 489 (2d Cir. 2008) (citations and quotations omitted).  The
party seeking to invoke collateral estoppel bears the burden of
establishing that each element of collateral estoppel is met.
*Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580
Ontario, Inc.*, 409 F.3d 87, 93 (2d Cir. 2005) (citing *May Ship
Repair Contracting Corp. v. Barge Columbia New York,* 160 F.
Supp. 2d 594, 599 (S.D.N.Y. 2001)).  The "actually litigated and
actually decided" and "necessary to the judgment" elements of

27

the estoppel analysis cannot be conflated.  *Janjua v. Neufeld*,
2017 WL 2876116 (N.D. Cal. Jul. 6, 2017), *aff'd*, 933 F.3d 1061
(9th Cir. 2019).

It is undisputed that Mr. Kakar has not met his burden
of establishing that the issue was actually litigated and
decided.  As a threshold matter, Mr. Kakar did not dispute that
the administrative record here fails to reflect that terrorism-
based inadmissibility had been actually litigated and actually
decided in the prior asylum proceeding.  (*See generally* Tr.)
Nevertheless, plaintiff argues that this court should not follow
the Second Circuit's doctrine of collateral estoppel, and should
instead follow the standard articulated in *Matter of Fedorenko*,
19 I. & N. Dec. 57, 61 (BIA 1984), which he contends does not
require "actual litigating and actual deciding" in the prior
proceeding.  (*See* Tr. 33-34, 43-44.)  Mr. Kakar does not,
however, cite any controlling case law that suggests that the
court may justifiably abandon the Second Circuit's longstanding
doctrine of collateral estoppel in this case.

Moreover, it is unclear that this court should adopt
plaintiff's reading of *Fedorenko*, which plaintiff contends is a
repudiation of the "actually litigated" requirement.  Contrary
to plaintiff's contention, the Board of Immigration Appeals in
*Fedorenko* noted: "The judicially-developed doctrine of
collateral estoppel, which is related to the doctrine of res

28

judicata, precludes parties to a judgment on the merits in a
prior suit from relitigating in a subsequent action issues that
were **actually litigated and necessary to the outcome** of the
prior suit." *Fedorenko*, 19 I. & N. Dec. 57, 61 (BIA 1984)
(emphasis added).  Then, the Board proceeded to elaborate on
this standard, including a "prior judgment between the parties
that is sufficiently firm to be accorded conclusive effect," a
"full and fair opportunity to litigate," and fairness to the
parties.  *Id.*  Because it is far from clear that the Board
intended to overturn or alter Second Circuit case law, as
opposed to merely listing the various requirements for
collateral estoppel, this court agrees with USCIS's argument
that *Fedorenko* does not support plaintiff's position.  (*See* ECF
No. 44, Def. Supp. Mem. 30, n. 10.)

        In the alternative, Mr. Kakar alleges, in a circular
fashion, that the issue of admissibility was "actually litigated
and actually decided" because if he was inadmissible, he would
not have been granted asylum.  (*See* ECF No. 31, Pl. Opp., at 4.)
No facts in the record support a finding that the immigration
judge actually considered the issue of admissibility, even if
the judge was obligated to do so.  (*See generally* ECF No. 16,
AR.)  On March 28, 2000, an Immigration Judge sitting in
Jamaica, New York granted Mr. Kakar asylum.  (*Id.* at 87-89.)
The judge provided no rationale for the Order, which issued via

a form printout on which a box was checked indicating the grant of asylum.  (*Id*. at 87.)  The Order only noted that the judge did not reach Mr. Kakar's application for withholding of removal.  (*Id*.)  Mr. Kakar alleges no facts and provides no evidence in support of his claims.

In *Janjua v. Neufeld*, a decision which was recently affirmed by the Ninth Circuit, the court encountered this precise issue.  The plaintiff, who was granted asylum, filed an application to adjust status, which was denied after USCIS determined that he was inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i) due to his participation in terrorist activities.  2017 WL 2876116, at *4.  The plaintiff appealed, arguing that USCIS was collaterally estopped from denying his petition based on terrorism-related grounds where the same facts that supported his claim for asylum were the predicate facts for the finding of inadmissibility, and the immigration judge necessarily had to adjudicate admissibility to grant asylum. *Id*.  However, the court held that "the necessarily decided element of collateral estoppel cannot be conflated with the actually litigated element of collateral estoppel." *Id*. at 9 (citing *United States v. Beane*, 841 F.3d 1273, 1283 (11th Cir. 2016)).  Like Mr. Kakar, the plaintiff in *Janjua* was unable to show that the issues of admissibility or his participation in terrorist activity were actually litigated because there was no

30

evidence that the issues were contested by the parties or submitted to the court for review. *Id.* at 10-11. As such, the court held that the issue of admissibility in light of terrorist activity was not actually litigated and collateral estoppel did not apply. *Id.* at 11. In its affirmance of the lower court's decision, the Ninth Circuit summarized, "Neither the question of whether MQM qualifies as a terrorist organization nor whether Janjua engaged in terrorist activity and was inadmissible as a result was raised, contested, or submitted for determination in Janjua's asylum proceedings." *Janjua*, 933 F.3d 1061, 1067-68 (9th Cir. 2019). Because those precise issues had not been "raised, contested, and submitted for determination" in Janjua's asylum proceedings, the government was not precluded from raising those issues in plaintiff's adjustment of status proceedings. *Id.* The same result is reached here.

  *Sile v. Napolitano*, which Mr. Kakar cites in support of his argument that his admissibility was actually litigated, is distinguishable because the issue of Sile's admissibility was addressed on the record. 2010 WL 1912645, at *3 (N.D. Ill. May 12, 2016) (finding "[t]he immigration judge's decision terminating the Exclusion Proceedings clearly states that the judge considered all the facts and circumstances of the case in terminating the INS's charges against Sile," and, "[t]he immigration judge's termination of the Exclusion Proceedings,

during which INS alleged that Sile was firmly resettled in Canada and therefore not admissible to the United States, was essential to the final judgment").

Plaintiff's opposition also cites a number of California district court decisions, which the court does not find persuasive for the reasons set forth below.  In *Khan v. Johnson*, 160 F. Supp. 3d 1199 (C.D. Cal. 2016), *Aldarwich v. Hazuda*, 2016 WL 1089173, at *11 (C.D. Cal. Mar. 18, 2016), and *Islam v. U.S. Dep't of Homeland Sec.*, 136 F. Supp. 3d 1088, 1094 (N.D. Cal. 2015), the California district courts appear to employ the same circular reasoning, as Mr. Kakar does here, to conflate the "actually litigated" requirement with the "necessarily decided" requirement.  These cases hold that because courts are obligated to assess admissibility in determining eligibility for asylum, even if admissibility is not addressed in the proceedings or final decision, the issue of admissibility has been actually litigated.  This runs counter to clearly established principles of collateral estoppel in the Second Circuit and, as such, is not persuasive.  Moreover, in light of the Ninth Circuit's recent affirmance in *Janjua v. Neufeld*, these California district court decisions regarding collateral estoppel doctrine in adjustment of status proceedings cannot be considered good law or relied upon by this court.

## Conclusion

For the foregoing reasons, defendant's cross-motion for summary judgment is GRANTED because its denial of plaintiff's adjustment of status is appropriately predicated upon INA section 212(a)(3)(B)(iii)(V), which is an independent and adequate basis for finding an alien inadmissible.  The court DENIES plaintiff's motion for summary judgment.  The Clerk of Court is respectfully directed to enter judgment in favor of the defendant and close the case.

**SO ORDERED.**

```
                                          /s/
                           _____
                           Hon. Kiyo A. Matsumoto
                           United States District Judge
```

Dated:     March 31, 2020
           Brooklyn, New York